WOODS EXPLORATION & PRODUC-
ING COMPANY, Inc., et al.,
Plaintiffs-Appellants,

v.

ALUMINUM COMPANY OF AMERICA
et al., Defendants-Appellees.

Nos. 28763, 29487.

United States Court of Appeals,
Fifth Circuit.

Jan. 5, 1971.

Rehearing Denied and Rehearing En
Banc Denied March 17, 1971.

Arthur J. Mandell, Mandell & Wright, Levert J. Able, Houston, Tex., for plaintiffs-appellants.

Leroy Jeffers, Ross Sterling, Robert E. Morse, Jr., Charles T. Newton, Jr., Houston, Tex., for defendants-appellees Aluminum Co. of America, Crown Central Petroleum Corp. and Lavaca Pipeline Co.; Vinson, Elkins, Searls & Connally, Houston, Tex., of counsel.

Before JOHN R. BROWN, Chief Judge, GOLDBERG and CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

This battle-scarred antitrust case and its antecedents, both lineal and collateral, have been in litigation without surcease, armistice, or truce since the early 1960's. The war today continues on two fronts —federal and state. Preserving for later the intimate factual details revealed in the myriad documents and testimony adduced below, we now sketch in the

main historical contours of the present dispute.

The trouble among the parties centers around their activities in the Appling Natural Gas Field in Jackson and Calhoun Counties, Texas. Defendants, Aluminum Company of America (Alcoa), Crown Central Petroleum Corporation (Crown), Lavaca Pipe Line Company (Lavaca), and alleged co-conspirators, F. E. Appling (Appling), Carl E. Siegesmund (now Pocantico Oil & Gas Corporation), and Houston Pipe Line Company (Houston), control nearly 90% of the 4,000 acre surface of the Appling Field. Plaintiffs, Woods Exploration & Producing Company (Woods Exploration), Stanley C. Woods (Woods), and Southeastern Pipeline Company (Southeastern), have in combination an interest in various small tracts in the Field which comprise a much smaller percentage of the total acreage. Competition over the extraction of natural gas from this common field is at the heart of the dispute.

Production from the Appling Field is regulated by the Texas Railroad Commission, and its regulatory activities have given birth to several suits between the parties with regard to Commission production allowables. Railroad Commission v. Aluminum Co. of America, Tex.1964, 380 S.W.2d 599, rev'g Tex.Civ. App.1963, 368 S.W.2d 818; Railroad Commission v. Woods Exploration & Producing Co., Tex.1966, 405 S.W.2d 313. In 1962 plaintiffs filed a state antitrust action alleging a combination or conspiracy on the part of defendants to eliminate or thwart plaintiffs from competing in the production of gas from the Appling Field. Shortly thereafter, in December 1962, plaintiffs filed the instant federal antitrust suit against defendants seeking injunctive relief and treble damages for alleged violations of the Sherman and Clayton Acts, 15 U.S.C.A. §§ 1, 2, 15, 26. By their complaint plaintiffs charged that defendants and their alleged co-conspirators had restrained trade in the production and marketing of natural gas from the Appling Field, 15 U.S.C.A. § 1,[1] and that defendants and their alleged co-conspirators had monopolized, attempted to monopolize, or combined and conspired to monopolize the production and marketing of gas from the Field, 15 U.S.C.A. § 2.[2] Acts charged in furtherance of the allegations in both the state and federal suits were of two basic types: (1) the filing of false nomination forecasts by defendants with the Texas Railroad Commission so as to reduce plaintiffs' production allowables; and (2) the thwarting of plaintiffs' gas production by defendants' refusal to deal, and by defendants' harassment and interference with plaintiffs' operations. Defendants responded in the instant suit with a motion to dismiss for failure to state a claim, and, in the alternative, a motion for summary judgment. Both motions were overruled by then District Judge Ingraham, Woods Exploration & Producing Co. v. Aluminum Company of America, S.D.Tex.1963, 36 F.R.D. 107. Several months later the Texas Court of Civil Appeals held that plaintiffs' state suit allegations set forth a cause of action under state law and ordered the case to trial. Woods Exploration & Producing Co. v. Aluminum Company of America, Tex.Civ.App.1964, 382 S.W.2d 343, writ ref. n. r. e. That case is still pending.

1. 15 U.S.C.A. § 1 provides:
   "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."

2. 15 U.S.C.A. § 2 provides:
   "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The present issues arose after the transferral of the federal action to the court of District Judge Singleton as a docket equalization measure in 1966. In Woods Exploration & Producing Co. v. Aluminum Company of America, S.D. Tex.1968, 284 F.Supp. 582, Judge Singleton, in a carefully written opinion, granted summary judgment for defendants with respect to plaintiffs' allegation of damages due to the filing of false nomination forecasts. The other allegations then proceeded to trial and were submitted to a jury upon special interrogatories. Although finding no restraint of trade in violation of section 1 of the Sherman Act, the jury found that defendants had monopolized, attempted to monopolize, or conspired to monopolize in violation of section 2, and awarded damages of $142,759 to Southeastern, and $500 to Woods Exploration. That verdict is reproduced in the margin.[3]

3. VERDICT

In connection with your deliberations of the following questions, you are instructed that plaintiffs have the burden of proof.

QUESTION NO. ONE

Did defendants Alcoa and Crown enter into an illegal contract, combination, or conspiracy to unduly and unreasonably restrain the trade or commerce of drilling for, producing, and transporting gas from the Appling Field?

Answer this question "Yes" or "No."

Answer: No.

QUESTION NO. TWO

Did Alcoa and Crown monopolize or attempt to monopolize or conspire with F. E. Appling, Carl E. Siegesmund, or Houston Pipe Line Company, or any one of them, or either of them, to monopolize any appreciable part of the trade and commerce of drilling for, producing, and transporting gas from the Appling Field?

Answer this question either "Yes" or "No."

Answer: Yes.

If you have answered Question Nos. One and Two "No," then you need not answer any of the following questions, but if you have answered Question No. One "Yes" or Question No. Two "Yes," or answered both Questions One and Two "Yes," then you will answer the following questions.

If you have answered Question Nos. One and Two "Yes," or either of them "Yes," then you will answer the following question:

QUESTION NO. THREE

3(a) As a result of such illegal contract, combination, or conspiracy, or as a result of a monopoly, or an attempt to monopolize, or conspiracy to monopolize inquired about in Questions Nos. One and Two, did Alcoa and Crown refuse to deal with Stanley C. Woods, individually, or Woods Exploration and Producing Company?

Answer this question either "Yes" or "No."

Answer: Yes.

3(b) As a result of such illegal contract, combination, or conspiracy, or as a result of a monopoly, or an attempt to monopolize, or conspiracy to monopolize inquired about in Questions Nos. One and Two, did Alcoa or Crown employ the surveying partnership of Johnston & Ford to make an incorrect survey of the Carancahua townsite property.

Answer this question either "Yes" or "No."

Answer: No.

3(c) As a result of such illegal contract, combination or conspiracy, or as a result of a monopoly, or an attempt to monopolize, or conspiracy to monopolize inquired about in Questions Nos. One and Two, did Alcoa or Crown harass or interfere with the operation of Woods Exploration & Producing Company in the drilling of wells on the townsite lots in the Appling Field.

Answer this question either "Yes" or "No."

Answer: Yes.

QUESTION NO. FOUR

Did Fred A. Wolcott sign plaintiffs' Exhibit No. 85A?

Answer this question either "Yes" or "No."

Answer: No.

If you have answered Questions Nos. One and Two "Yes," or either of them "Yes," and if you have answered Question No. Four "No," then you will answer the following question:

QUESTION NO. FIVE

As a result of such illegal contract, combination, or conspiracy, or as a result of a monopoly, or an attempt to monopolize, or conspiracy to monopolize inquired about in Questions Nos. One and Two, did defendants, acting together with F. E. Appling, prevent Fred Wolcott from signing plaintiffs' Exhibit No. 85A?

Note 3—Continued

Answer this question either "Yes" or "No."

Answer: Yes.

If you have answered Questions Nos. One and Two "Yes," or either of them "Yes," and if you have answered Question No. Four "No", then you will answer the following question:

QUESTION NO. SIX

As a result of such illegal contract, combination, or conspiracy, or as a result of a monopoly, or an attempt to monopolize, or conspiracy to monopolize inquired about in Questions Nos. One and Two, did defendants, acting together with F. E. Appling, prevent any other authorized representative of Lumar Gas Corporation, from entering into an agreement with plaintiffs Southeastern Pipeline Company, Stanley C. Woods, or Woods Exploration & Producing Company relating to the transportation of plaintiffs' gas from the Appling Field?

Answer this question either "Yes" or "No."

Answer: No.

Answer: $142,759.00

\* At the time the verdict was accepted by the court the foreman of the jury clarified that the figure should be $39,600. (Tr. 3343–44).

QUESTION NO. SEVEN

What sum of money, if any, would fairly and reasonably compensate plaintiff Southeastern Pipeline Company for the damages, if any, sustained by it to the date on which this trial began, December 2, 1968, which damages, if any, were proximately caused by the illegal combination or conspiracy, or the illegal monopoly, or attempt to monopolize, or conspiracy to monopolize, if any?

If you have answered Questions Nos. 4, 5 and 6, "No." then in connection with your answer to this Question No. Seven relating to damages, if any, you are not to take into consideration in connection with your deliberations of damages, if any, to Southeastern Pipeline Company, any testimony or evidence relating to the building by Southeastern Pipeline Company of a gas transmission pipeline from the Appling Field to connect with the Tennessee Gas Transmission line, or the cost of any such line.

Answer this Question No. Seven by stating the amount in dollars and cents.

"1) Loss of pipe purchased & not used = $4,059."
"2) 6 wks. loss production on 16,000 mcf/day at 11¢/mcf gross ÷ 2 for net = $79,200*"
"3) Loss of building 2nd pipeline $99,100."

QUESTION NO. EIGHT

What sum of money, if any, would fairly and reasonably compensate Woods Exploration & Producing Company for the damages, if any, sustained by it to the date on which this trial began, December 2, 1968, which damages, if any were proximately caused by the illegal combination or conspiracy or the illegal monopoly, or attempt to monopolize, or conspiracy to monopolize, if any?

If you have answered Question 3(a) "No," then in connection with your deliberations concerning this question No. Eight, you will not take into consideration any testimony or evidence relating to the failure on the part of Alcoa and Crown to deal with Stanley C. Woods, individually, or Woods Exploration and Producing Company concerning the transportation of gas out of the Appling Field.

If you have answered Question 3(b) "No", then in connection with your deliberations concerning this Question No. Eight, you will not take into consideration any testimony or evidence relating to an incorrect survey or conflict in surveys in connection with your assessment of damages, if any, to Woods Exploration & Producing Company.

If you have answered Question 3(c) "No." then in connection with your deliberations concerning this Question No. Eight, you will not take into consideration any testimony or evidence relating to any harassment or interference with the operations of Woods Exploration & Producing Company in the Appling Field in connection with your assessment of damages, if any, to Woods Exploration & Producing Company.

You will answer this Question No. Eight by stating the amount in dollars and cents.

Answer: $500.00.

Finding this result unsupported by the evidence, the court below granted defendants' motion for judgment notwithstanding the verdict. Woods Exploration & Producing Co. v. Aluminum Company of America, S.D.Tex.1969, 304 F. Supp. 845. Moreover, the court also issued an injunction enjoining plaintiffs from prosecuting their action then pending in the state court. The present appeal is a consolidation of plaintiffs' separate appeals from the decisions below. Disagreeing with the district court, we reverse and remand in part. In order to facilitate the explanation of our ruling, we consider in separate sections the various grounds raised on appeal.

## I

Plaintiffs' first specification of error involves the partial summary judgment granted by the court below. In their complaint plaintiffs sought to recover as damages the loss of production from their wells in the Appling Field which had been occasioned by the entry of orders by the Texas Railroad Commission setting production allowables for plaintiffs' wells at levels lower than plaintiffs thought they should have received. Liability was alleged against defendants on the ground that the Railroad Commission orders had been based in part on false nomination forecasts and reports filed by defendants with the Commission. While the trial court found that it was "clear that there are disputed issues of fact on whether defendants actually conspired together and whether they deliberately filed the false nominations," it granted summary judgment for defendants, since it found that "even if plaintiffs' allegations in these respects are true, plaintiffs would still not be entitled to recover damages for these activities." We disagree.

Free competition among well producers is limited by Texas law in order to prevent waste. The allowable production which each well in the Appling Field is permitted to produce is set monthly by order of the Texas Railroad Commission. The Commission is mandated to limit total production from the field to the reasonable market demand for gas made upon the field. See Vernon's Ann. Tex.Rev.Civ.Stat. art. 6008 § 3(h). Each producing well is entitled to its fair share of the total allowable field production, an amount roughly proportional to the volume of gas in place under the tract on which the well is drilled. *Id.* § 12; see Brown v. Humble Oil & Ref. Co., 1935, 126 Tex. 296, 83 S.W.2d 935, 944.

While no statutory provision prescribes the procedure by which market demand is to be determined, the Commission has usually followed the procedures described in its Statewide Rule 31. Under that rule, market demand is determined primarily on the basis of Producer's Forecasts filed with the Commission by operators having wells in the field. These nominations state the volume of gas which each producer expects to be able to market from his wells the following month. The nominations are totaled and, if the Commission concludes that their total accurately reflects market demand, the total becomes the field allowable. If the Commission disagrees with the forecasts, it is empowered to consider other factors, such as average production for the previous twelve months, or nominations filed by purchasers of gas. See Railroad Commission v. Woods Exploration & Producing Co., Tex.1966, 405 S.W.2d 313.

After determining the total allowable for the field, the Commission has followed the practice of calculating the allowable for each well by application of a one-third—two-third proration formula. One-third of the field allowable is divided among the wells in the proportion to which the surface acreage attached to the well bears to the combined surface acreage of all wells in the field. Two-thirds of the field allowable is divided among the wells in the proportion that each well bears to the total number of wells. This heavy emphasis upon the well factor has meant that producers with wells on small tracts have been permitted to extract far more gas than their

acreage would justify. This effect is compounded by the fact that many wells on large tracts, although producing at full capacity, have been unable to produce the allowable assigned to them under the formula. As a result the amount they have been unable to produce has been allocated by the Commission to the small-tract wells not already producing at full capacity. Because of its inequitable effect on large tract owners, the one-third—two thirds formula was declared invalid by the Texas Supreme Court. Atlantic Ref. Co. v. Railroad Commission, Tex.1962, 346 S.W.2d 801. However, the formula retains its vitality in the Appling Field because of Railroad Commission v. Aluminum Company of America, Tex.1964, 380 S.W.2d 599. The Texas Supreme Court there held that the formula could not be invalidated with respect to the Appling Field since large-tract owners were guilty of laches in attacking it. Although the court recognized the inequalities in the formula, it found this defect outweighed because "stability in respect to proration formulas is vital to the well being of the industry as a whole, to the property owners in the field and to the public at large."

It was in this context that plaintiffs alleged that defendants attempted to subvert the effects of the proration formula by filing false production forecasts to reduce the total field allowable. The trial court held that even if this allegation were true there would be no liability on the ground that the combined action by defendants to influence the Railroad Commission allowables did not violate the Sherman Act. It held that "any injury which *any* producer claims to have suffered because of the allowable assigned to him is an injury directly inflicted by the Railroad Commission and not an injury inflicted by his fellow producers directly or through the exercise of any discretionary power conferred upon them by the State."

The trial court's theory rests in part on Parker v. Brown, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, where the Supreme Court held that a state agricultural marketing program was exempt from the Sherman Act, even though the program would have violated the Act if effected by a combination of private parties. Stressing that the program had been established under state legislation and was administered by a group appointed by the Governor and confirmed by the State Senate, the Court found that such direct governmental involvement was outside the pale of the proscriptions of the antitrust acts:

"We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." 317 U.S. at 350–351, 63 S.Ct. at 313.

See also United States v. Rock Royal Cooperative, 1938, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. Defendants assert that since their nominations became a part of the Commission's final production allowable orders, plaintiffs' alleged injury is solely the result of state action. Defendants place principal reliance on our decision in Okefenokee Rural Elec. Membership Corp. v. Florida Power & Light Co., 5 Cir. 1954, 214 F.2d 413. In *Okefenokee* the plaintiff brought an antitrust suit against Florida Light & Power Company and the City of Jacksonville, Florida, alleging that defendants had unlawfully conspired to exercise exclusive control over the territory into which plaintiff was seeking to extend electric power lines. The only feasible route along which a new power line could be built paralleled Federal Highway 17. Plaintiff applied to the Florida State Road Department for permission to construct a line along the route. In order to defeat plaintiff's application, de-

fendants constructed a "spite line" along the same route. Despite the fact that this line served no purpose other than to block plaintiff's application and could serve only two persons, defendants made a misleading argument before the Road Department that a line had already been constructed and that no new line should be built. Subsequently, the Road Department denied plaintiff's application. The district court dismissed the complaint for failure to state a claim, and this court affirmed, stating:

> "In brief, all of the damages averred in the complaint and all that are shown to be probable have been suffered or will accrue from the denial of the right to use this 'only feasible route', which in turn results from the denial of a permit by the State Road Department of Florida, and from the rules and regulations governing the use of County roads by the Board of County Commissioners of Duval County, Florida. It is not claimed that either the State Road Department or the Board of County Commissioners was acting beyond its respective jurisdiction, or that for any other reason its action was invalid.

> "As so forcibly illustrated in Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183, 'Injury implies violation of a legal right.' The plaintiff had no legal right to use the state highway without a permit from the State Road Department, nor the county roads without permission of the Board of County Commissioners, and those authorities have decided against the plaintiff. So long as their decisions stand the plaintiff has not been legally injured, notwithstanding it may have been irreparably damaged." 214 F.2d at 418.

We think *Okefenokee* is distinguishable and does not compel affirmance of the judgment below. It is true that both *Okefenokee* and the instant case involve state participation. That proposition however, only begins the analysis, for it is not every governmental act that

points a path to an antitrust shelter. We reject "the facile conclusion that action by any public official automatically confers exemption." George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 1 Cir. 1970, 424 F.2d 25, 30. In Asheville Tobacco Board of Trade, Inc. v. FTC, 4 Cir. 1959, 263 F.2d 502, 509, the court stated:

> "The teaching of Parker v. Brown is that the antitrust laws are directed against individual and not state action. When a state has a public policy against free competition in an industry important to it, the state may regulate that industry in order to control or, in a proper case, to eliminate competition therein. It may even permit persons subject to such control to participate in the regulation, provided their activities are adequately supervised by independent state officials. Rice v. Chicago Board of Trade, 331 U.S. 247, 253, note 4, 67 S.Ct. 1160, 91 L.Ed. 1468; United States v. South-Eastern Underwriters Association, 322 U.S. 533, 562, 64 S.Ct. 1162, 88 L.Ed. 1440; Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035. See also note in 95 Pa.L.Rev. 223, 229. But such action must be state action, not individual action masquerading as state action. A state can neither authorize individuals to perform acts which violate the antitrust laws nor declare that such action is lawful."

See also Costilo, Antitrust's Newest Quagmire: The Noerr-Pennington Defense, 66 Mich.L.Rev. 333, 340–43 (1967).

The concept of state action is not susceptible to rigid, bright-line rules. Each case must be considered on its own facts in order to determine whether or not the anti-competitive consequence is truly the action of the state. Bearing this in mind, we think that the exaggerated and misleading argument made by defendants in *Okefenokee* is fundamentally different from the filing of false factual data with regard to gas production. While in *Okefenokee* there was state ac-

tion in the sense that the state can be said to have intended the resulting final order which adversely affected plaintiffs, the same cannot be said of the consequences of the Railroad Commission order at issue here. Phrasing the relevant criteria in other terms, the court in *Whitten* said:

"Unlike Paddock, we do not read *Continental Ore* [Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777] to mean that any action by a Canadian public official would have resulted in exemption. An anti-competitive practice may receive only the most cursory inspection by public officials, *see* Woods Exploration [& Producing] Co. v. Alcoa [Aluminum Company of America], 36 F.R.D. 107 (S.D.Texas 1963), or public officials may approve conduct without consideration or awareness of its anti-competitive aspects. *Cf.* Angle v. Chicago, St. Paul, Minneapolis and Omaha Rwy. Co., 151 U.S. 1, 14 S.Ct. 240, 38 L.Ed. 55 (1893). The issue in such cases is not whether the action was in form 'governmental', but whether the real decision makers were public officials or private businessmen. *See* American Bar Association, 1955–1968 Antitrust Developments, 211–12 (1968)." 424 F.2d at 33, n. 8.

Thus, while in *Okefenokee* defendants presented misleading arguments, the pleadings did not allege falsification of facts. Further, the misstatements that were made were readily verifiable. Consequently, there was no allegation that the governing authority's decision to award the route to defendants was premised upon false information. The adverse result with regard to plaintiffs can therefore be said to have flowed from state rather than private action. Conversely, in the case at hand there is an allegation that the Commission's production allowable order rested upon false facts adduced by defendants. There was, moreover, no opportunity for meaningful supervision or verification. Because of the amount and character of

nomination predictions, the Railroad Commission of necessity must rely on the truthfulness of the gas producers. Such facts are usually in the exclusive control of those producers, so the final order of the Commission often must accept the nomination at face value. Hence, defendants' conduct here can in no way be said to have become merged with the action of the state since the Commission neither was the real decision maker nor would have intended its order to be based on false facts. Indeed, plaintiffs' basic claim is that the applicable production allowable formula which the state would have intended to utilize was subverted to the injury of plaintiffs by defendants' filing of false nomination forecasts. The situation is analogous to the filing of fraudulent statements with the Patent Office, which has been held to be evidence of an antitrust violation. Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 1965, 382 U.S. 172, 86 S. Ct. 347, 15 L.Ed.2d 247. See generally Costilo, *supra* at 348–50.

Our case is also similar to Continental Ore Co. v. Union Carbide & Carbon Corp., 1962, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777, where the Supreme Court held that defendants' anticompetitive activities were not protected under the *Parker* rationale. There, a private firm acting as administrator of Canada's wartime rationing program used its discretionary power to exclude a competing processor of vanadium ore from the Canadian market. In defense of a private treble damage action, defendants asserted that the purchasing agent was acting as an administrator of the Canadian Government and that the conduct was therefore privileged under *Parker*. The Supreme Court, stressing that there was no evidence that the Canadian Government had approved of the conduct of its agent, held that such conduct was subject to the Sherman Act. Again, in United Mine Workers of America v. Pennington, 1965, 381 U.S. 657, 671, 85 S.Ct. 1585, 1594, 14 L.Ed.2d 626, the Court reiterated this rationale and distinguished *Continental Ore* on the ground that in that

case there had been no indication that any Canadian official "would have approved of joint efforts to monopolize the production and sale of vanadium \* \*."

Similarly, the Texas regulatory scheme at issue in this case does not sanction defendants' alleged conduct. While the scheme clearly provides for inhibitions upon competitive production, it is the Railroad Commission which is empowered to set production allowables. In doing so, the Commission of necessity must rely in part on nomination forecasts and reports filed by producers. But the discretion accorded the producers is circumscribed; their forecasts must be based on the volume of gas which each expects to be able to market from his wells the following month. Defendants were not clothed with discretion to subvert this scheme by filing unjustifiably low forecasts in order to reduce the production allowables. While state remedies may exist to correct this conduct, such activities also may state a cause of action under the federal antitrust laws.[4]

Even if the conduct of defendants cannot be denominated state action and thus immunized under *Parker*, defendants assert that it is immunized by the doctrine of Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 1960, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464, and United Mine Workers of America v. Pennington, *supra*, which hold that joint efforts to influence public officials in the passage of laws are beyond the scope of the antitrust laws.

In *Noerr* the Supreme Court held that a railroad association's efforts to secure state legislation harmful to truckers who competed with the railroads were exempt from the Sherman Act, even though deceptive and intended to reduce competition. The decision in *Noerr* is premised on the principle that valid legislative or

executive action which results in the restraint or monopolization of trade does not violate the Sherman Act. See Parker v. Brown, *supra*. Consequently, attempts to influence the legislative and executive branches must also be excluded from the Sherman Act because prohibiting such activity

"would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade. In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., *supra*, 365 U.S. at 137, 81 S.Ct. at 529.

█ Basic to *Noerr* is a belief that regulation of competition by the political process is legitimate and not proscribed by the Sherman Act, an enactment which is itself a political decision. For the political process to be effective there must be freedom of access, regardless of motive, to ensure the "right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws." 365 U.S. at 139, 81 S.Ct. at 530. See generally Note, Application of the Sherman Act to Attempts to Influence Government Action, 81 Harv.L.Rev. 847 (1968). Where these political considerations are absent the *Noerr* doctrine is inapplicable. See Note, The Brakes Fail on the Noerr Doctrine, 57 Calif.L.Rev. 518 (1969). The policies of the Sherman Act should not be sacrificed simply because defendants employ governmental processes to accomplish anti-competitive purposes. Otherwise, with governmental

---

4. The Railroad Commission scheme itself provides that "nothing herein shall in any manner affect, alter, diminish, change or modify the anti-trust and/or monopoly statutes of this State, and that no provision of this Act shall in any manner directly or indirectly authorize a violation of such anti-trust and/or monopoly statutes \* \* \*." Tex.Rev.Civ.Stat.Ann. art. 6049d, § 13. *Cf.* Woods Exploration & Producing Co. v. Aluminum Company of America, Tex.Civ.App.1964, 382 S.W. 2d 343.

activities abounding about us, government could engineer many to antitrust havens. We think that the doctrine should not be extended unless the factors upon which *Noerr* rested are present and require the same result. In Trucking Unlimited v. California Motor Transport Co., 9 Cir. 1970, 432 F.2d 755, the Ninth Circuit refused to immunize under *Noerr* a scheme whereby trucking companies conspired to oppose before state and federal regulatory commissions all applications by competitors for the issuance, transfer, or registration of operating rights. Characterizing the licensing procedure as adjudicative, the court felt that the defendants were not seeking to influence a policymaking function; rather they were attempting to undermine a well defined policy with regard to licensing operators by blocking and discouraging access to the governmental agencies. Similarly, in the instant case there has been no attempt by defendants through the filing of false nominations to influence the policies of the Railroad Commission. The germination of the allowable formula was political in the *Noerr* sense, and thus participation in those rulemaking proceedings would have been protected. But the formula's subsequent implementation is apolitical. Once the rule is promulgated, defendants may not plead immunity in their attempt to undermine its efficacy for anticompetitive purposes. In George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., *supra*, 424 F.2d at 32, the court reached a similar conclusion with regard to a different subject matter:

"But the efforts of an industry leader to impose his product specifications by guile, falsity, and threats on a harried architect hired by a local school board hardly rise to the dignity of an effort to influence the passage or enforcement of laws. By 'enforcement of laws' we understand some significant policy determination in the application of a statute, not a technical decision about the best kind of weld to use in a swimming pool gutter.'

When Judge Ingraham below denied defendants' motion for summary judgment on the pleadings, he recognized the inapplicability of *Noerr* to the facts of this case:

"As a second ground for dismissal the defendants argue that the allegedly false nominations were made in an attempt to influence governmental action, and therefore, as a matter of law, cannot be a violation of the antitrust legislation. The case of Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1960), is deemed to be controlling. It was charged in that suit that the defendant railroads had conspired, through a concerted publicity campaign, to obtain the passage of legislation which was detrimental to the interests of the trucking business. The court found no basis for imputing to the Sherman Act a purpose to regulate *political* activity, and held that the railroads' activities were outside the ban of the Act 'at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws.' 365 U.S. at 138, 81 S.Ct. at 530.

"First, is the conduct complained of in the instant case political in nature? If the defendants were enjoined from conspiring to submit false nominations to the Railroad Commission would they be deprived of any Constitutional right to petition or participate in the Governmental process? The answer clearly seems to be that the defendants would only be prohibited from undertaking certain joint business behavior. To subject them to liability under the Sherman Act for conspiring to restrict production or to eliminate a competitor would effectuate the purposes of the Sherman Act and would not remotely infringe upon any of the constitutionally protected freedoms spoken of in Noerr." 36 F.R.D. at 111–112.

See also Woods Exploration & Producing Co. v. Aluminum Company of America, Tex.Civ.App.1964, 382 S.W.2d 343.

Defendants and the court below, however, argue that the decision in *Pennington*, decided subsequent to Judge Ingraham's opinion, has extended the *Noerr* immunity. We disagree. In *Whitten* the court faced a similar contention and found that *Pennington* posited no extension of the *Noerr* rationale:

"*Noerr* was followed by *Pennington*, a case involving an effort by large mine operators and union officials to persuade the Secretary of Labor to prescribe higher minimum wages for companies selling coal to the TVA on long-term contracts. This effort at persuasion would seem to fall well within the *Noerr* immunity for attempts to influence the enforcement of laws. The Walsh-Healy Act, 41 U.S.C.A. § 35 *et seq.*, conferred considerable discretion on the Secretary of Labor to set wage levels in the public interest, and required the Secretary to observe the strictures of the Administrative Procedure Act, including notice, public hearing, and judicial review, in making wage rulings. 41 U.S.C. §§ 35(b), 43a; Costilo, AntiTrust's Newest Quagmire: The Noerr-Pennington Defense, 66 Mich.L.Rev. 333, 344–345 (1967). Nevertheless, the trial court instructed the jury that efforts to influence the Secretary were illegal if part of a broader conspiracy to drive small mineowners from business. Pennington v. United Mine Workers, 325 F.2d 804, 817 (6th Cir. 1963). The Court of Appeals took an even more restrictive view, holding that *Noerr* shielded only good-faith attempts to influence public officials, 'unaccompanied by a purpose or intent to further a conspiracy to violate a statute.' 325 F.2d at 817. In rejecting these restrictive views of *Noerr*, the Supreme Court observed:

'Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.' 381 U.S. 657, at 670, 85 S.Ct. 1585 at 1593, 14 L.Ed.2d 626.

"Paddock [the plaintiff] seizes on this statement to buttress its position that efforts to influence any public official are exempt. In context, however, the Court's emphasis is not on the role of the public officials involved, but rather on the irrelevance of intent or conspiracy in applying the *Noerr* doctrine." 424 F.2d at 32–33 (footnote omitted).

■ We therefore find *Noerr-Pennington* inapplicable to the alleged filing of false nominations by defendants because this conduct was not action designed to influence policy, which is all the *Noerr-Pennington* rule seeks to protect. In light of this determination we hold that the abuse of the administrative process here alleged does not justify antitrust immunity. Consequently, we reverse the grant of summary judgment and remand the issue for an evidentiary determination of whether or not defendants in fact filed false nominations, and, if so, what damages plaintiffs sustained therefrom.

## II.

Plaintiffs' next specification of error is that the trial court erred in granting a judgment notwithstanding the verdict for plaintiffs on the issue concerning monopolization. The plaintiffs had contended that the defendants violated the Sherman and Clayton Acts by refusing to deal with the plaintiffs regarding production and transportation of gas produced from plaintiffs' wells and by otherwise interfering with the plaintiffs' operations in the Appling Field. After the submission of special issues the trial court granted judgment for the defendants notwithstanding the following verdict of the jury:

"*Question No. Two*

Did Alcoa and Crown monopolize or attempt to monopolize or conspire

with F. E. Appling, Carl E. Siegesmund, or Houston Pipe Line Company, or any one of them, or either of them, to monopolize any appreciable part of the trade and commerce of drilling for, producing and transporting gas from the Appling Field?

Answer: Yes."

### A. The Statute of Limitations

Defendants first argue, however, that regardless of any possible substantive error in granting the judgment n. o. v., plaintiffs are procedurally barred from recovery upon the affirmative answer given by the jury to the second interrogatory. Appellees entreat us to apply the applicable four-year statute of limitations[5] as a lethal blow to appellants' recovery.

The statute applies, appellees contend, because the facts added in the 1965–1968 amended complaints—emphasizing section 2 monopolization—cannot relate back to the original complaint filed in 1962—emphasizing false nominations. We scorn this approach, which would make us antediluvian in construing Fed.R.Civ.P. 15(c).[6] Chief Judge Brown has articulated for this court the liberality with which we should approach Rule 15(c):

"The starting point for our analysis is F.R.Civ.P. 15(c), which deals with the relation back of pleading amendments. The Rule provides essentially that whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleadings, the amendment will relate back to the date of the original pleading. The doctrine of relation back under Rule 15(c) is liberally applied today in the Federal Courts, especially if no disadvantage will accrue to the opposing party. 1A Barron & Holtzoff, Federal Practice and Procedure § 448 (Wright ed. 1960). Rule 15(c) is 'based on the idea that a party who is notified of litigation concerning a given transaction or occurrence is entitled to no more protection from statutes of limitations than one who is informed of the precise legal description of the rights sought to be enforced.' 3 Moore, Federal Practice 15.15 [2], at 1021.

"Of course, we are committed to the proposition that leave to amend should be given freely when justice requires. Longbottom v. Swaby, 5 Cir. 1968, 397 F.2d 45; Lone Star Motor Import, Inc. v. Citroen Cars Corp., 5 Cir. 1961, 288 F.2d 69.

"Clearly notice is the critical element involved in Rule 15(c) determinations. Cf. Tiller v. Atlantic Coast Line R. R. Co., 1945, 323 U.S. 574, 65 S.Ct. 421, 89 L.Ed. 465; New York Cent. & H. R. R. Co. v. Kinney, 1922, 260 U.S. 340, 43 S.Ct. 122, 67 L.Ed. 294. See generally 1A Barron & Holtzoff, Federal Practice and Procedure § 448 (Wright ed. 1960). This Court, too, has previously emphasized this. 'The Federal rule on the "relation back' of amendments to pleadings, as embodied in Federal

5. 15 U.S.C.A. § 15b provides:
   "Any action to enforce any cause of action under section 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued."

6. That rule provides:
   "(c) Relation Back of Amendments. Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him."

Rule 15(c) is permissive. As long as the amended complaint refers to the same transaction or occurrence that formed the basis for the original complaint and the defendant was put on notice of the claim by the first complaint, there will be no bar to amendment; even new defendants and new theories of recovery will be allowed.' Travelers Ins. Co. v. Brown, 5 Cir., 1964, 338 F.2d 229, 234." Williams v. United States, 5 Cir. 1968, 405 F.2d 234, 236–237 (footnote omitted).

This liberality is particularly persuasive in antitrust suits where there is ample opportunity for discovery and other pre-trial procedures. Cf. Western Geophysical Co. of America v. Bolt Associates, Inc., D.Conn.1969, 305 F.Supp. 1248, 1249 (" * * * antitrust pleadings need not be in a particular technical form as long as they present 'a short and plain statement of the claim showing that the pleader is entitled to relief' as required by Fed.R.Civ.P. 8. This is particularly true in a case such as this where there have already been several pre-trial conferences and extensive discovery has been taken"). The court below allowed the amendments, and we think that this ruling was well within its discretion. A fair reading of the initial pleadings clearly shows that the plaintiffs, in addition to their false nomination claim, were alleging that the defendants monopolized the extraction of gas from the Appling Field. Appellees were neither surprised nor prejudiced, as their extensive fact-ferreting and myriad defense marshalling testifies. The compendious record in this case justifies our conclusion that no one was litigating in darkness. We therefore turn to the factual background necessary to assess the validity of the judgment n. o. v.

### B. Factual Background

In 1949 defendants Alcoa and Crown entered into joint operating agreements covering an area of interest located within the territory now known as the Appling Field, a substantial portion of which was owned in fee by F. E. Appling. After confirming the desirability of the area as a drilling prospect, Alcoa obtained leases from Appling and engaged him to obtain oil and gas leases from the other landowners in the field. Subsequently, Carl Siegesmund (now Pocantico Oil Corporation) entered into the joint agreement for development of the field. By 1957 these parties owned or held leases on approximately 90% of the 4,000 acre surface of the Appling Field.

Alcoa caused its wholly-owned subsidiary Lavaca to construct a pipeline into the Appling Field to transport the gas produced from the field to Alcoa's aluminum smelter at Point Comfort, Texas. On July 14, 1955, Alcoa, Crown, and Pocantico entered into a gas marketing agreement with Houston Pipe Line Company. This company purchased gas produced in the Appling Field owned by Alcoa, Crown, and Pocantico, accepted delivery at Point Comfort, and transported a portion of such gas to Monsanto Chemical Company in Texas City and Chocolate Bayou, Texas.

In 1959 plaintiff Woods became interested in the Appling Field, especially that portion known as the Carancahua Beach Townsite located in Calhoun County, which generally consisted of small, vacant town lots. The acreage of these lots amounts to considerably less than one-half of one percent of the entire acreage of the Appling Field. Around 1960 plaintiff Woods Exploration, the stock of which is wholly owned by plaintiff Woods, began leasing up these small lots. After defendants refused to unitize or pool drilling operations, plaintiffs commenced their own drilling, and completed nine or ten gas wells. Woods and Woods Exploration, in order to sell or transport their gas production from the wells, attempted to utilize the pipeline of Alcoa's subsidiary, Lavaca, the only available outlet. The evidence shows and the jury found that these efforts were unsuccessful largely because Lavaca refused to deal with plaintiffs. Plaintiffs then formed

Southeastern Pipeline Company to transport the gas. Subsequently, Lumar Gas Pipeline Corporation (Lumar) and Appling executed a right-of-way agreement whereby Lumar was enabled to construct a pipeline for the transmission of natural gas over lands belonging to Appling. This agreement contained a provision obligating Lumar to accept for delivery and transportation, and to purchase or acquire for delivery or transportation, natural gas from wells situated in the area which purchases were to be made only from the wells which were first approved and accepted by Appling. When Woods, Woods Exploration, and Southeastern attempted to utilize the Lumar Pipeline, they were rebuffed. In particular, Lumar, relying on its obligation to Appling, refused to execute a contract with Southeastern which had been in the process of negotiation. Moreover, during this period Appling refused to grant Southeastern a pipeline easement across his land unless an overriding royalty was paid on any gas transported through the pipeline across his land. Southeastern eventually was forced to file condemnation proceedings for a right-of-way over Appling's land and to construct its own line to transport gas from the Woods' wells in the Appling Field to the pipeline of Tennessee Gas (now Tenneco). Production and transportation of gas from the Woods' wells began on January 1, 1961. As gas was produced it was sold to Southeastern, which transported the gas to the Tenneco line, which further transmitted the gas to Southeastern's customer, Bayou Hydrocarbons Company in Houston, Texas.

Plaintiffs' basic allegations arising out of these facts were that defendants violated the antitrust laws by refusing to deal with plaintiffs so that plaintiffs could drill for, transport, and market their gas, and by harassing plaintiffs' efforts to drill and complete their wells.

Thus, plaintiffs allege that they were injured by (1) defendants' refusal to transport plaintiffs' gas through the Lavaca pipeline, (2) defendants' conspiracy with Appling to prevent either the transportation of gas through the Lumar pipeline or the grant of a reasonable pipeline easement to Southeastern; (3) defendants' refusal to unitize or pool; and (4) defendants' harassment of plaintiffs in connection with plaintiffs' drilling operations.

After the jury verdict for plaintiffs, the court granted defendants' motion for judgment n. o. v. It reasoned as follows:

"In the final analysis, this Court must hold that the conduct of the defendants does not fit the definition of the offense condemned by section 2 of the Act. In addition, this Court holds that the Appling Field is not the relevant geographic market; that under the definition of the word "monopoly" these defendants as a matter of law lack the power to control prices or exclude competition; that whatever may have been placed within the control of the defendants in this case was the consequence of an historic accident (the discovery of the Appling Field); that their efforts to protect the natural gas they discovered by this historic accident was neither exclusionary, unfair, or predatory; and that they, and each of them, were not disempowered to defend their position fairly. This Court would again say that efforts before the Railroad Commission to prevent the drainage of gas from under the Appling Field by the small tract operators, including Woods, was fair. All of the other acts and conduct attempted to be proved by plaintiffs amounted to nothing more than conduct for which plaintiffs might have a cause of action under some tort theory.

Additionally, the agreements which plaintiffs contend brought about the monopoly and the combination in this case are the usual and customary types of agreements used in the oil and gas industry, that is, joint operating agreements, pooling agreements, unitization agreements, lease agreements, right-of-way agreements, and

such agreements do not result in a limitation of the supply of gas in interstate commerce or any price fixing of gas. If the Sherman Antitrust Act were to be literally construed as plaintiffs contend, it would condemn any type of joint operating agreement, or pooling agreement, or unitization agreement. In considering the "commercial realities" of this business, such would be an absurd result.

\* \* \* \* \* \*

Finally, this opinion and the Court's action in this case must be taken together with this Court's opinion and reasoning in Woods Exploration & Producing Co. et al. v. Aluminum Company of America et al., supra. Simply stated, the activities of the defendants in this case, when considered in conjunction with the discovery of, the production of, the transportation of, and the marketing of oil and gas, do not lend themselves to a cause of action under the Sherman Antitrust Act. There is no price fixing or attempt at price fixing involved. The product dealt with is one that is heavily regulated both in this case by the State of Texas and, with respect to marketing and price, by the Federal Power Commission. Efforts on the part of these agencies to protect the public in the conservation of this resource is necessary and, of course, monopolistic in a sense.

It would seem to this Court that courts should be reluctant to hold that the Sherman Antitrust Act applies to the type of agreements used in this case. They are the same type of agreements used in almost all activities in the oil and gas field, where the development of the product is regulated and the output is controlled, and the rights of the public are well protected. The ultimate recovery of the product is necessarily controlled, but not for the purpose of restraining trade or reducing competition of a character or a type contemplated by the antitrust laws." 304

F.Supp. at 850–852 (footnotes omitted).

### C. Possible Exemption from Antitrust Laws

■ The district court's opinion seemed to imply that because of extensive regulation the oil and gas industry is not susceptible to the strictures of the antitrust laws. We cannot agree with this determination of the trial court. True the production, gathering, and transportation of natural gas in the Appling Field is subject to regulation by the Texas Railroad Commission. See, e. g., Tex.Rev.Civ.Stat.Ann. art. 6008; 15 U.S.C.A. § 717(b). The Commission is empowered to regulate competition in order to mitigate its abuse. But this state regulation does not mean that there is no room for antitrust policies to operate. Our antitrust laws constitute our economic magna carta, designed to protect against predatory oppression. Conceived as such a writ they must not be facilely negated. As the Supreme Court has reminded us, "immunity from antitrust laws 'is not lightly implied.'" United States v. First City Nat. Bank, 1967, 386 U.S. 361, 368, 87 S.Ct. 1088, 1093, 18 L.Ed.2d 151, quoting California v. FPC, 369 U.S. 482, 485, 82 S.Ct. 901, 8 L.Ed.2d 54. We therefore think it incumbent upon this court to render both state regulatory and federal antitrust goals complementary rather than mutually exclusive. As Judge Wright expressed the matter in Northern Nat. Gas Co. v. FPC, 1968, 130 U.S.App.D.C. 220, 399 F.2d 953, 959:

"Despite a continuing debate, it appears that the basic goal of direct governmental regulation through administrative bodies and the goal of indirect governmental regulation in the form of antitrust law is the same—to achieve the most efficient allocation of resources possible. For instance, whether a regulatory body is dictating the selling price or that price is determined by a market free from unreasonable restraints of trade, the desired result is to establish a selling

price which covers costs plus a reasonable rate of return on capital, thereby avoiding monopoly profits. Another example of their common purpose is that both types of regulation seek to establish an atmosphere which will stimulate innovations for better service at a lower cost. This analysis suggests that the two forms of economic regulation complement each other."

█ Therefore, while we cannot hold that actions taken pursuant to Commission regulations violate the antitrust laws, we can hold that actions taken to subvert the Commission scheme for anticompetitive purposes are subject to antitrust strictures. See Tex.Rev.Civ. Stat.Ann. art. 6049d, § 13; Woods Exploration & Producing Co. v. Aluminum Company of America, Tex.Civ. App.1964, 382 S.W.2d 343; cf. Silver v. New York Stock Exchange, 1963, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed. 2d 389. Considering this distinction, we think that plaintiffs have alleged conduct which is not immunized solely because of regulation by the Texas Railroad Commission. The state regulatory scheme has established quotas for the production of natural gas from the Appling Field. Plaintiffs have alleged that the defendants attempted to subvert this scheme by agreeing among themselves to obstruct and frustrate the extraction of gas by plaintiffs so as to preserve the gas pool for defendants. While the Commission, through its production allowables, could restrain defendants' production of gas, it could not prevent defendants from inhibiting extraction by plaintiffs. Moreover, we are reinforced in our view that this conduct is not immune from federal antitrust regulation by virtue of the Texas statutory scheme itself, which recognizes the continued vitality of the antitrust laws within the natural gas industry. Tex. Rev.Civ.Stat.Ann. art. 6049d, § 13.

### D. Sherman Act Section 2

The trial court held that even if the antitrust laws did apply, plaintiffs' allegations did not support a violation of section 2 of the Sherman Act. We now consider that ruling. In doing so we bear in mind that on reviewing a judgment notwithstanding the verdict we must "consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion." Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374 (en banc).

Section 2 of the Sherman Act makes it unlawful to:

" * * * monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations * * *."

██ Dispensing first with preliminaries, we think it obvious that the production, transportation, and sale of natural gas constitutes a "part of" "trade or commerce" for purposes of the Sherman Act. See United States v. El Paso Natural Gas Co., 1964, 376 U.S. 651, 657, 84 S.Ct. 1044, 12 L.Ed.2d 12; United States v. Grinnell Corp., 1966, 384 U.S. 563, 573, 86 S.Ct. 1698, 16 L.Ed.2d 778. Nor do we tarry long over defendants' argument that the complained of activities were intrastate without adverse impact upon interstate commerce. Crown and Alcoa did business in states other than Texas and were engaged in the production, transportation, and sale of gas from the Appling Field which entered into the flow of interstate commerce. The effect on interstate commerce need not have been gargantuan nor precisely mathematicized. It is sufficient if it is more than merely inconsequential. California v. Lo-Vaca Gathering Co., 1965, 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357; Mandeville Island Farms v. American Crystal Sugar Co., 1948, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc., 5 Cir. 1967, 383 F.2d 97, cert. denied, 1968, 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870; Utah Gas Pipe-

lines Corp. v. El Paso Natural Gas Co., D.Utah, 1964, 233 F.Supp. 955.

■ The difficult question is whether defendants monopolized, attempted to monopolize, or conspired to monopolize within the intendment of section 2. The offense of monopolization has been described by the Supreme Court to consist of the following elements:

"[T]he offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., *supra*, 384 U.S. at 570–571, 86 S.Ct. at 1704.

The related offenses of attempting to monopolize and combining or conspiring to monopolize do not require that actual possession of monopoly power be shown before the cause of action is established. However, they do require evidence of a specific intent to destroy competition or to build a monopoly. Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277; Lewis v. Pennington, 6 Cir. 1968, 400 F.2d 806, cert. denied, 1968, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444; United States v. Consolidated Laundries Corp., 2 Cir. 1961, 291 F.2d 563. There currently exists some dispute over whether either attempts to monopolize or con-

spiracies to monopolize require proof of the relevant market or ability to achieve monopoly power.[7] Since special issue number 2 would have permitted the jury to find a violation of any one of the three elements of Sherman Act section 2, plaintiffs and defendants devote sizeable portions of their arguments to this question. We do not resolve this conflict over the requisites of conspiracies or attempts, for we find that plaintiffs have satisfied the evidentiary requirements of the offense of monopolization. Disagreeing with the trial court, we hold that the Appling Field clearly constitutes the relevant geographic market, and that the jury could find that defendants possessed sufficient power in that market to monopolize the production of natural gas.

Defendants argue that the Appling Field cannot constitute a relevant market for it is a source of supply rather than a market. This argument, however, fails to recognize that "relevant market" is simply a shorthand phrase used to describe "the arena within which the strength of competitive forces is measured." P. Areeda, Antitrust Analysis ¶ 201, at 71 (1967). It does not necessarily mean the selling place.

In United States v. Pabst Brewing Co., 1966, 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765, the Supreme Court reversed a lower court dismissal under § 7 of the Clayton Act, 15 U.S.C.A. § 18, grounded upon failure to prove the relevant

---

7. Thus, cases have seemingly split as to whether a dangerous probability of monopolization is an essential element of proof. Compare Bernard Food Indus., Inc. v. Dietene Co., 7 Cir. 1969, 415 F.2d 1279, 1284, cert. denied, 1970, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92; Cliff Food Stores, Inc. v. Kroger, Inc., 5 Cir. 1969, 417 F.2d 203; Hiland Dairy, Inc. v. Kroger Co., 8 Cir. 1968, 402 F.2d 968, cert. denied, 1969, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748, with Lessig v. Tidewater Oil Co., 9 Cir., 327 F.2d 459, cert. denied, 1964, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046; United States v. Consolidated Laundries Corp., supra. See generally Blecher,

Attempt to Monopolize Under Section 2 of the Sherman Act: "Dangerous Probability" of Monopolization Within the "Relevant Market," 38 Geo.Wash.L.Rev. 215 (1969). Other cases have held that the requisite specific intent at least comprehends an intent "to gain control over some relevant market sufficient to set prices in that market or to exclude competitors therefrom." American Football League v. National Football League, D.Md.1962, 205 F.Supp. 60, aff'd, 4 Cir. 1963, 323 F.2d 124. Compare Bowl America, Inc. v. Fair Lanes, Inc., D.Md. 1969, 299 F.Supp. 1080, 1093, with United States v. Consolidated Laundries, Corp., supra.

market. The Court's language is instructive:

"Apparently the District Court thought that in order to show a violation of § 7 it was essential for the Government to show a 'relevant geographic market' in the same way the corpus delicti must be proved to establish a crime. But when the Government brings an action under § 7 it must, according to the language of the statute, prove no more than that there has been a merger between two corporations engaged in commerce and that the effect of the merger may be substantially to lessen competition or tend to create a monopoly in any line of commerce *in any section of the country.*' (Emphasis supplied.) The language of this section requires merely that the Government prove the merger may have a substantial anti-competitive effect somewhere in the United States—'in *any* section' of the United States. This phrase does not call for the delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of ground. The Government may introduce evidence which shows that as a result of a merger competition may be substantially lessened throughout the country, or on the other hand it may prove that competition may be substantially lessened only in one or more sections of the country. In either event a violation of § 7 would be proved. Certainly the failure of the Government to prove by an army of expert witnesses what constitutes a relevant 'economic' or 'geographic' market is not an adequate ground on which to dismiss a § 7 case. Compare United States v. Continental Can Co., 378 U.S. 441, 458, 84 S.Ct. 1738, 12 L.Ed.2d 953, 964. Congress did not seem to be troubled about the exact spot where competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country. Proof of the section of the country where the anticompetitive effect

exists is entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States." 384 U.S. at 549–550, 86 S.Ct. at 1667–1668 (footnote omitted).

Cf. United States v. Grinnell Corp., *supra,* 384 U.S. at 573, 86 S.Ct. 1698 (section 7's use of "any section of the country" equated to section 2's "any part of the trade or commerce among the several states").

Plaintiffs do not argue that defendants possess or have attempted to possess monopoly power over the marketing of natural gas. They instead contend that defendants possess monopoly power over the extraction of gas from the Appling Field. An essential fact in the natural gas industry is that adjoining land owners usually extract gas from a common gas reservoir. Thus, if one producer can inhibit or eliminate the extraction of gas by another, the inhibitor can prolong the life of the field and enhance his own future production figures. With regard to extraction of gas—which is at the heart of plaintiffs' complaint—the Appling Field therefore is the relevant area of competition. It is the "part" of "trade or commerce" with regard to which we must measure the power to exclude competitors. See American Tobacco Co. v. United States, 1946, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575.

Directly in point is the recent decision in Denver Petroleum Corp. v. Shell Oil Co., D.Colo.1969, 306 F.Supp. 289. In *Denver Petroleum* plaintiffs alleged that defendant oil company had attempted to monopolize and had monopolized the purchase of crude oil and condensate in a particular oil production area by refusing to transport oil other than its own in its pipeline. With regard to the relevant market, the court stated:

"The next matter for consideration is the problem of the so-called 'relevant market'. Our conclusion has been that for purposes of this case the relevant geographic area is

Rio Arriba County, New Mexico, and particularly what has been called the Basin-Rio Arriba oil production area included therein. While it is likely that defendant's monopoly power extends as far as its illegal operation of the pipelines as private carriers is effective to isolate the crude supply, there is no real need to expand consideration to the other areas of Northwest New Mexico. Plaintiffs would have us believe that they proposed to operate in the Basin-Rio Arriba oil production area; if there is not a monopoly there it matters not in this case that there might be monopoly power in other areas, and if there is, as we have found, a monopoly in that area, it similarly makes no difference, under our approach, that the monopoly may encompass a larger area.

Defendant would have us engage in market analysis, considering the full breadth of 'economic and competitive realities,' to determine that the market structure is, if not nationwide, at least as broad as the entire Four Corners region. And there is no doubt whatever that Shell does not possess a monopoly of purchasing in any of these larger areas considered as a whole.

However, in our opinion, such analysis is unnecessary in this case and the 'relevant market' is in that sense irrelevant. We have here a practice illegal in itself, operation of the pipelines as private carriers, a purpose and the obvious natural effect of which was to exclude nonlocal competition from the crude supply which Shell badly needed. When one must 'look' for a monopoly, determining a relevant market in which to look and in which to evaluate competitive effects is obviously an essential first step. But when, with an illegal practice such as is present here in mind, one can look at an area and see the existence of monopoly power, not by inference from market share, but by determining actual ability to exclude competition and control prices,

there appears no real need to go further." 306 F.Supp. at 304.

Likewise in the present case we can look to the Appling Field and see the existence of a practice "the obvious natural effect of which was to" eliminate or thwart competitive extraction of gas from the Field by plaintiffs. Nor does it matter that this circumscribed area of competition is small, or that the effect on the public at the place of ultimate sale may be minor. In Klor's, Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741, the Supreme Court considered the sufficiency of allegations under sections 1 and 2. There plaintiff, a single retail store operator, contended that defendants had conspired to boycott and to refuse to deal by not selling certain brands to plaintiff. The lower courts had dismissed the complaint because it had been shown that there were hundreds of other retailers near Klor's who sold many of the brands defendants refused to sell to Klor's. Thus, the courts reasoned, "there was no charge or proof that by any act of defendants the price, quantity, or quality offered the public was affected." The Supreme Court reversed:

"This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale, and in some instances forbids them from selling to it on any terms whatsoever. It interferes with the natural flow of interstate commerce. It clearly has, by its 'nature' and 'character,' a 'monopolistic tendency.' As such it is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by

driving them out in large groups. In recognition of this fact the Sherman Act has consistently been read to forbid all contracts and combinations 'which "tend to create a monopoly,'" whether 'the tendency is a creeping one' or 'one that proceeds at full gallop.' International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20, 26." 359 U.S. at 213, 79 S.Ct. at 710 (footnotes omitted).

■ We therefore hold that the trial court erred in finding that the Appling Field was not a relevant market. Nor do we hold, as defendants contend, that the issue of the appropriate relevant market should at least have been sent to the jury. In its instructions to the jury the court assumed as a matter of law that the Appling Field was the relevant market. Following the verdict the trial court felt compelled to change this ruling and granted judgment n. o. v. in part, reasoning that as a matter of law the Appling Field was not the relevant market. Since the pertinent facts are not in dispute, we hold that the Appling Field is a relevant market for determining monopoly power under section 2 and do not remand this issue for trial.

■ Viewing the Appling Field as the relevant market, we think the jury was warranted in finding that defendants possessed monopoly power in that Field. Defendants contend first that the evidence demonstrates that plaintiffs in fact were able eventually to produce their production quota[8] so that defendants' lack of monopoly power is apparent. We disagree. While plaintiffs did eventually manage to produce their production quota, they incurred both increased expenditures and lost production due to defendants' conduct. More important, we do not think that absolute success in excluding competition is an essential element to proving monopoly power under section 2. It is enough that defendants' market position is such

that they have substantial power to thwart competition. The defendants here and their alleged co-conspirators owned or leased approximately 90% of the Appling Field. Their holdings were so situated that they could block transportation from competing wells. We think that the jury could find on this state of the facts that defendants possessed monopoly power in the Appling Field within the meaning of the Act.

■ Mere monopoly power in a relevant market, however, is not sufficient in itself to constitute a violation of section 2. *Grinnell* teaches us that monopoly power is actionable only if it is willfully acquired or maintained. The instant case does not involve such obvious violations as price fixing or allocation of markets. Nevertheless, prior cases have amply demonstrated that conduct designed to barricade access to markets or inhibit production can constitute a proscribed means of monopolization. Judge Gewin, speaking for this court in North Texas Producers Ass'n v. Young, 5 Cir. 1962, 308 F.2d 235, 241, cert. denied, 1963, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733, summarized some of the types of conduct which have been held violative of the Act:

"Violations of the act have been manifested in numerous ways as illustrated by the following cases: The act of a group of motion picture distributors who, together, have a monopoly in the distribution of pictures, who combined and conspired to refuse to furnish films to a particular exhibitor, to cause a breach of contracts with him and to prevent him from carrying on his business, Binderup v. Pathé Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; a conspiracy of competing appliance retailers and manufacturers and distributors of appliances who agreed not to sell appliances to the plaintiff, Klor's, or to sell only at discriminatory prices or on unfavorable terms, even though there were opportunities to buy

---

8. Of course, plaintiffs allege that this quota was unjustifiably parsimonious due to defendants' filing of false nomination forecasts.

in a competitive market, Klor's Inc. v. Broadway-Hale Stores, Inc., Admiral Corp., et al., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741; the exclusion by a board of trade having monopolistic power, of an owner of a warehouse from a tobacco market, American Federation of Tobacco Growers, Inc. v. Neal (4 Cir., 1950), 183 F.2d 869; exclusion of a competitor from a building and an appropriate market for business opportunities without justifiable business reasons, Gamco, Inc. v. Providence Fruit & Produce Building, Inc. (1 Cir., 1952), 194 F.2d 484; an agreement of brewers of beer not to sell to a particular person or class of persons, Johnson v. Joseph Schlitz Brewing Co. (D.C.E.D.Tenn., 1940) 33 F.Supp. 176; agreement among competitors to fix minimum resale prices of their products, Kiefer-Stewart Co. v. Joseph E. Seagram & Sons (1951), 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219. There are many other cases which present a myriad of situations demonstrating ingenuity, disguise, intrigue and subterfuge to avoid the appearance of law violation."

We think that plaintiffs' allegations come within the spirit and rationale of these cases. Basically, plaintiffs contend that defendants violated section 2 by their (1) refusal to unitize or pool; (2) refusal to transport plaintiffs' gas; (3) harassment in drilling; and (4) refusal to grant a right-of-way to Southeastern. In essence, plaintiffs paint a picture of concerted action by defendants to restrain, hinder, or eliminate plaintiffs' extraction of gas from the common gas reservoir shared with defendants. We are not saying that pooling, unitization, and joint operating agreements are in themselves maligned under the Sherman Act, but even if we consider that the Act impliedly immunizes these collective activities as benign in themselves, they cannot be the instruments of economic predatism or oppression. Buying and selling are innocent activities in and of themselves but each can be converted into an antitrust malefaction. We think that the pattern of conduct alleged here may be held unlawful under the Sherman Act. Cases involving concerted refusals to deal,[9] see Klor's, Inc. v. Broadway-

9. Defendants spend a good deal of time arguing that as a matter of law there can be no finding of a refusal to deal by Lavaca. They first argue that since Lavaca is a wholly-owned subsidiary of Alcoa, does not carry gas for anyone else, and does not compete with Alcoa, any refusal was merely a unilateral refusal. Secondly, defendants argue that there was insufficient evidence to show that Woods tendered his gas to Lavaca. Conversely, plaintiffs argue that Lavaca did carry gas for other companies in addition to Alcoa; moreover, plaintiffs contend that under Texas law Lavaca is both a common purchaser, Tex.Rev.Civ.Stat.Ann. art. 6049a and a common carrier, Tex.Rev.Civ. Stat.Ann. art. 6050, and thus is under an obligation to carry plaintiffs' gas. Finally, plaintiffs allege that the evidence as to Woods' offer, while disputed, has been resolved by the jury in favor of plaintiffs. We quickly dispose of the issue of the sufficiency of the evidence. There was here sufficient evidence upon which the jury might have found both that Woods tendered his gas which was then refused by Lavaca and that Lavaca carried gas for others. Likewise, we find without

merit defendants' argument that the refusal to transport gas was merely a lawful unilateral refusal by Lavaca. Defendants first fail to realize that while section 1 or section 2 conspiracies evidenced by refusals to deal do require a combination or conspiracy between two or more entities, section 2 monopolization or attempted monopolization does not. Therefore, even if the refusal is viewed as the act of Alcoa, it would furnish a basis for finding monopolization or attempted monopolization if it constitutes either a "willful maintenance" of monopoly power or a specific intent to obtain monopoly power. See National Screen Service Corp. v. Poster Exchange, Inc., supra, 305 F.2d at 651–652; Fiumara v. Texaco, Inc., E.D.Pa., 204 F.Supp. 544, 552, aff'd, 3 Cir. 1962, 310 F.2d 737. However, we think that in any event the alleged action by Lavaca could not be characterized as a unilateral refusal to deal. Judge Thornberry has stated the rule with regard to section 1, and we feel it is equally applicable to conspiracies under section 2:

"It is settled that 'common ownership and control does not liberate corporations from the impact of the antitrust

Hale Stores, Inc., *supra*; Times-Picayune Publishing Co. v. United States, *supra*; National Screen Service Corp. v. Poster Exchange, Inc., 5 Cir. 1962, 305 F.2d 647, conspiracy to deny access to markets, see North Texas Producers Ass'n v. Metzger Dairies, Inc., 5 Cir. 1965, 348 F.2d 189, cert. denied, 1966, 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468; Premier Electrical Constr. Co. v. Miller-Davis Co., 7 Cir. 1970, 422 F.2d 1132, and refusal to permit utilization of facilities, Silver v. New York Stock Exchange, *supra*; Denver Petroleum Corp. v. Shell Oil Co., *supra*, support the conclusion here that defendants violated section 2 of the Sherman Act. At least the jury could so find.

### E. Damages

We next turn to the issue of damages. At trial the jury awarded Woods Exploration $500 and Southeastern $142,-759.[10] Defendants claim this was error by making the following argument.

"Furthermore, under the uncontroverted evidence all of the Appling Field gas wells and Appling Field gas involved was Woods' gas and not Southeastern's, and all dealing with reference to transportation of such gas from such wells was with Woods. Any refusal to deal by Appellees was limited by Question No. 3(a) to Woods or Woods Exploration & Producing Company and any damage award from refusal to deal or causing refusal to deal was limited by the jury answer to Question No. 8 to $500 to Woods Exploration & Producing Company."

We first note that, contrary to defendants' contentions, the answer to Question 3(a), which found that Alcoa and Crown refused to deal with Woods and Woods Exploration, does not preclude any damage award to Southeastern. Damages to Southeastern were predicated upon a finding that Lumar refused to transport plaintiffs' gas because of illegal conduct by defendants and Appling after the formation of Southeastern. The affirmative answer to Question 5 constitutes a jury finding that defendants did indeed prevent Lumar, acting through Wolcott, from consummating its deal with Southeastern despite the fact that Question 4 determined that Lumar's president never signed a contract. The affirmative answer to Question 3(a) merely constitutes an additional finding that defendants also refused to deal with Woods and Woods Exploration, based upon the evidence tending to show that Lavaca refused to transport Woods' gas prior to the formation of Southeastern. In Question 8 the jury found that the refusal to deal in Question 3(a) damaged Woods to the extent of $500. In Question 7 it found that defendants' conduct with respect to Lumar in Question 5 damaged Southeastern to the extent of $142,759. The latter damages are clearly supported by the evidence, consisting of (1) the cost of pipe which had been purchased by Southeastern to connect Woods' wells to Lumar's line, and which could not be used since Lumar refused to deal; (2) the unnecessary expense incurred by Southeastern in building a second pipeline running alongside the Lumar line; and (3) the loss by Southeastern of the sale of 16,000 m. c. f. of gas per day occasioned by six weeks' loss of gas production due to Lumar's illegally-inspired refusal to deal. We therefore

laws,' Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 1951, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219, and subsidiary or affiliate corporations are capable of conspiring with their parent corporation for the purposes of section 1 of the Sherman Act. *See, e. g.,* Timken Roller Bearing Co. v. United States, 1951, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199; United States v. Yellow Cab Co., 1947, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed.

2010." Cliff Food Stores Inc. v. Kroger, Inc., supra, 417 F.2d at 205–206. Whether or not Lavaca was a common carrier under Texas law, the jury would be warranted in finding an illegal conspiracy to monopolize the field, evidenced in part by a refusal to transport plaintiffs' gas.

10. See note 3, *supra*, where the jury's answers to the special issues are reproduced in full.

reject defendants' assertion that either damages must be limited to $500 or at least resubmitted to a jury.

On the other hand, plaintiffs argue that the trial court erred in eliminating from the jury's deliberations any possible damages which might have arisen from the lost opportunity to participate in the construction of a liquid extraction plant. Plaintiffs introduced evidence to show (1) that Southeastern and Lumar reached an agreement whereby Lumar would erect an extraction plant on its pipeline, and Southeastern would both share in the investment and participate in the profits; (2) that defendants thwarted this agreement to the damage of Southeastern; (3) that Southeastern reached similar tentative agreements with Graver Oil & Gas Equipment Company and Marler Construction Company for the erection of a plant on the Southeastern pipeline; and (4) that defendants frustrated these agreements to the damage of Southeastern. The trial court, in its charge to the jury, excluded any consideration of damages flowing from the failure to construct an extraction plant.

■ This ruling was apparently based upon the fact that in a treble damage suit under § 4 of the Clayton Act, 15 U.S.C.A. § 15, plaintiff must allege and prove that he has been "injured in his business or property" by acts of the defendant proscribed by the antitrust laws. Since the extraction plant was simply a proposal and not a tangible reality, the court below must have felt that it did not constitute "business or property." We think this was error. The rule of this circuit has been well stated by Judge Bell in Martin v. Phillips Petroleum Co., 5 Cir. 1966, 365 F.2d 629, 633, cert. denied, 1967, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451:

> "There are numerous decisions stating that one need not have an actual going business to obtain standing, but an attempt to enter a business is sufficient. Triangle Conduit & Cable Co., Inc. v. National Electric Products Cor-

poration, 3 Cir., 1945, 152 F.2d 398; American Banana Co. v. United Fruit Co., 2 Cir., 1908, 166 F. 261; Waldron v. British Petroleum Co., Ltd., S.D.N.Y., 1964, 231 F.Supp. 72; Delaware Valley Marine Supply Company v. American Tobacco Company, E.D. Pa.1960, 184 F.Supp. 440. However, these decisions lay down two significant requirements. First, there must be the intention to enter the business; and second, there must be a showing of preparedness to enter the business. This is the rule in this circuit. See North Texas Producers Association v. Young, 5 Cir., 1962, 308 F.2d 235, cert. den., 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733, where the court stated the rule, and that the plaintiff there met the business requirement."

See also Denver Petroleum Corp. v. Shell Oil Co., *supra*, 306 F.Supp. at 307–308. We think that the evidence here could support a finding that plaintiff Southeastern had both the intention and the preparedness to construct an extraction plant and that, if the jury so finds, Southeastern would be entitled to damages. Therefore, upon remand, plaintiffs should be afforded an opportunity to prove such damages before a jury.

### F. Reconciliation of the Verdict

■ Defendants finally contend that even if the judgment n. o. v. was improper, we may not simply reinstate the jury verdict that defendants monopolized, attempted to monopolize, or conspired to monopolize in violation of section 2. Rather, defendants argue, the answers to the special interrogatories are so hopelessly in conflict that we must at least reverse and remand for a new trial on liability. Defendants basically contend that the answer of the jury to question number 1, that Alcoa and Crown had not combined or conspired in restraint of trade, cannot be reconciled with the affirmative answer to special interrogatory number 2, that Alcoa and Crown had monopolized, attempted to monopolize, or combined and conspired to monopolize in conjunction with one

or more of several named persons. We find this argument without merit. Section 1 requires a combination or conspiracy. We think that the jury's negative answer to question number 1 was simply a recognition that the interrogatory was incomplete. That is, the jury found that Alcoa and Crown in combination only with themselves had not restrained trade. The evidence would support the conclusion that only with the aid of Appling and others were Alcoa and Crown enabled to restrain trade through such conduct as refusing to deal with plaintiffs. This conclusion is wholly consistent with an affirmative answer to question 2, wherein the jury found that Alcoa and Crown monopolized, attempted to monopolize, or conspired to monopolize with Appling or others. Since the findings are reconcilable, we must assume that the jury intended this consistency. See generally United States v. National City Lines, 7 Cir., 186 F.2d 562, cert. denied, 1951, 341 U.S. 916, 71 S.Ct. 735, 95 L.Ed. 1351.

For the foregoing reasons, we reverse the judgment n. o. v. and order the district court to reinstate the jury verdict which found that defendants monopolized, attempted to monopolize, or conspired to monopolize with the result that plaintiff Woods Exploration was damaged to the extent of $500 and that plaintiff Southeastern was damaged to the extent of $142,759. We further order the district court to hold a trial for the purpose of determining if plaintiffs' allegations with respect to the proposed extraction plant are true, and, if so, the extent of the damages flowing therefrom.

### III.

We at last turn to the propriety of the injunction issued against plaintiffs by the court below which restrained plaintiffs from prosecuting their state court suit. That suit, filed just prior to the instant federal action, sought damages for (1) violations of the antitrust laws of the State of Texas; (2) willful misrepresentation to the Texas Railroad Commission; (3) tortious interference with contract or advantageous business relationship and prevention of business expansion; and (4) violation of the Texas Common Purchaser's Statute. In addition, the plaintiffs sought exemplary damages. The district court, after rendering summary judgment and judgment n. o. v. in favor of defendants in the instant suit, enjoined plaintiffs from further prosecuting this state court suit.

The starting point for determining the legality of this action by the trial court is the federal anti-injunction statute, 28 U.S.C.A. § 2283, which reads:

"A court of the United States may not grant an injunction to stay proceedings in a state court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

While earlier cases under the predecessor of this statute were to the contrary, e. g., Toucey v. New York Life Ins. Co., 1941, 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100, recent cases have held that the present anti-injunction statute permits a federal court "to enjoin the relitigation of cases and controversies which have been fully adjudicated" in such court in order "to protect or effectuate its judgment." Jackson v. Carter Oil Co., 10 Cir. 1950, 179 F.2d 524, 526–527, cert. denied, 1951, 340 U.S. 812, 71 S.Ct. 39, 95 L.Ed. 597; accord, Jacksonville Blow Pipe Co. v. RFC, 5 Cir. 1957, 244 F.2d 394; 1A J. Moore, Federal Practice ¶ 0.208 [3.—3], at 2319; Note, Federal Power to Enjoin State Court Proceedings, 74 Harv.L.Rev. 726 (1961).

Plaintiffs, however, contend that the decisions in Atlantic Coast Line R. R. Co. v. Brotherhood of Locomotive Engineers, 1970, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234, and Donovan v. City of Dallas, 1964, 377 U.S. 408, 84 S.Ct. 1579, 12 L.Ed.2d 409, have eroded the "relitigation" exception. We disagree. Both cases caution against the dangers of federal-state friction which might be aroused by injunctive interference, but neither de-

cision purports to undermine the exceptions to § 2283. In *Donovan* the Supreme Court held that a state court cannot validly enjoin a person from prosecuting an *in personam* action in a federal court which has jurisdiction of the parties and of the subject matter. The decision was grounded upon the fact that federal-court remedies are rights "granted by Congress and cannot be taken away by the State." The converse proposition, however, does not hold true, for Congress can authorize federal interference with state court remedies in order to protect federal jurisdiction. The Court in *Donovan* said as much when it noted:

> "While Congress has seen fit to authorize courts of the United States to restrain state-court proceedings in some special circumstances [citing § 2283], it has in no way relaxed the old and well-established judicially declared rule that state courts are completely without power to restrain federal-court proceedings in *in personam* actions like the one here." 377 U.S. at 412–413, 84 S.Ct. at 1582.

In *Atlantic Coast Line R.R. Co.*, the Court simply decided that federal courts do not have inherent power to enjoin state proceedings but must abide by the express exceptions to § 2283. The Court reasoned:

> "On its face the present Act is an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions. The respondent here has intimated that the Act only establishes a 'principle of comity,' not a binding rule on the power of the federal courts. The argument implies that in certain circumstances a federal court may enjoin state court proceedings even if that action cannot be justified by any of the three exceptions. We cannot accept any such contention. In 1954 when this Court interpreted this statute, it stated: 'This is not a statute conveying a broad general policy for appropriate ad hoc application. Legis-

lative policy is here expressed in a clear-cut prohibition qualified only by specifically defined exceptions.' Amalgamated Clothing Workers v. Richman Brothers, 348 U.S. 511, 515–516, 75 S.Ct. 452, 99 L.Ed. 600, 607–608, (1955). Since that time Congress has not seen fit to amend the statute and we therefore adhere to that position and hold that any injunction against state court proceedings otherwise proper under general equitable principles must be based on one of the specific statutory exceptions to § 2283 if it is to be upheld. Moreover since the statutory prohibition against such injunctions in part rests on the fundamental constitutional independence of the States and their courts, the exceptions should not be enlarged by loose statutory construction. Proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately this Court."

398 U.S. at 286, 90 S.Ct. at 1743.

The "relitigation" principle, therefore, retains its vitality and means simply that a federal court may enjoin a state proceeding which is precluded under the doctrine of *res judicata*. As one commentator has noted, "this is a sensible solution to the problem of relitigation of federal decisions. It prevents multiple litigation of the same cause of action and it assures the winner in a federal court that he will not be deprived of the fruits of his victory by a later contrary state judgment which the Supreme Court may or may not decide to review." Note, Federal Power to Enjoin State Court Proceedings, *supra*, at 734. See also Developments in the Law—Injunctions, 78 Harv.L.Rev. 993, 1052 (1965). We think that in the instant case the district court decision was *res judicata* of the state proceeding and thus justified the issuance of an injunction.

The principle of *res judicata* "makes a final, valid judgment conclusive on the parties, and those in privity with them,

as to all matters, fact and law, that were or should have been adjudicated in the proceeding." 1B J. Moore, Federal Practice ¶ 0.405 [1], at 624. Plaintiffs argue that this doctrine is inapplicable with respect to concurrent federal and state antitrust suits. They contend that "a person who has suffered damages in his business or property by reason of violations of the antitrust laws of the United States and those of the State of Texas may pursue his remedy in both federal and state courts and recover damages in each action." In essence, plaintiffs would have us hold that their state and federal court suits do not constitute alternative avenues to remedy the same wrong.

It is true that numerous cases have held that the federal antitrust laws are not preemptive of state antitrust regulation. E. g., Standard Oil Co. of Kentucky v. Tennessee, 1910, 217 U.S. 413, 30 S.Ct. 543, 54 L.Ed. 817. Texas courts, recognizing the complementary features of this federal-state regulation, have further held that the pendency of a federal antitrust action involving the same parties and the same operative facts does not preclude the prosecution of a state action. E. g., Sessions Co. v. W. A. Sheaffer Pen Co., Tex.Civ.App.1961, 344 S.W. 2d 180; Bergholm v. Peoria Life Ins. Co., Tex.Civ.App.1933, 63 S.W.2d 1064. This does not mean, however, that the federal and state suits constitute separate causes of action. Rather, those cases simply hold that prior to a final judgment the federal antitrust laws do not have a preemptive effect. Cf. *Areeda, supra,* at 56–59. We therefore reject plaintiffs' contention that the decision of Woods Exploration & Producing Co. v. Aluminum Company of America, Tex. Civ.App.1964, 382 S.W.2d 343, which held that plaintiffs had alleged a cause of action under state law, is now the law of the case and precludes the injunction issued by the court below. That case arose prior to any final decision in the instant case and has no bearing on any preclusive effect that might be accorded the federal decision once rendered.

Nor are we persuaded that the state and federal suits constituted separate causes of action because they alleged the violation of primary duties imposed by separate sovereignties—the state and federal governments. Cases have held that both the state and federal governments may enforce concurrently their antitrust laws, see United Shoe Machinery Corp. v. United States, 1922, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708; State v. Southeast Texas Chapter of Nat. Elec. Contr. Ass'n, Tex.Civ.App.1962, 358 S. W.2d 711, but the court in F. L. Mendez & Co. v. General Motors Corp., 7 Cir., 161 F.2d 695, cert. denied, 1947, 332 U.S. 810, 68 S.Ct. 111, 92 L.Ed. 387 pointed out the inapplicability of such analogies to private antitrust suits:

"The essential teaching [referring to *United Shoe* where Court permitted separate government suits under Sherman and Clayton Acts] is that the Government had a right to complain of violations of each of two different statutes. Here we are deciding the question of whether a plaintiff who avers that his contract right to sell defendant's automobiles has been invaded through the wrongful action of defendant may maintain a second action therefor after once having lost. We hold that such a plaintiff can not split that cause of action; that he must assert in his suit all wrongful acts on the part of defendant upon which he relies to show invasion of his asserted right and that, if he fails, he may not, later, recover in another suit for invasion of the same right by wrongful acts on defendant's part which he failed to assert in his original suit. It is clear that plaintiff suffered but one actionable wrong and was entitled to but one recovery, whether his injury was due to one or another of wrongful actions by defendant or to a combination of some or all of them. There is, under either view, but a single wrongful invasion of a single primary right, whether the acts constituting such invasion are one or many, simple or complex. Baltimore S. S. Co. v. Phillips,

274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069."

We think the proper test was stated in Engelhardt v. Bell & Howell Co., 8 Cir. 1964, 327 F.2d 30, 31, where the court rejected plaintiff's allegation that the "District Court erred in granting appellee's motion for summary judgment because a cause of action based upon violation of the Federal Anti-Trust Acts (Title 15, U.S.C.) is distinct from a cause of action based upon state anti-trust law, and is not barred under the doctrine of *res judicata* by the prior adjudication of cases based upon such state statutes." The court held that "the primary test for comparing causes of action has long been whether or not the primary right and duty, and the delict or wrong combined are the same in each action." *Id.* at 32. See also Seaboard Coast Line R.R. Co. v. Gulf Oil Corp., 5 Cir. 1969, 409 F.2d 879. Applying this test to the instant case, we hold that plaintiffs' state action consists simply of alternative grounds of recovery for violations of the same primary rights alleged in the present federal action. The state action was characterized by the Texas Court of Civil Appeals as follows:

"Appellants, Woods Exploration & Producing Company, Inc., and Southeastern Pipe Line Company, sued appellees, Aluminum Company of America, Crown Central Petroleum Corporation, Carl E. Siegesmund, Lavaca Pipe Line Company, Lumar Gas Corporation, F. E. Appling and Fred Wolcott, for damages allegedly due to violations of the Texas Antitrust Statutes involving a conspiracy and combination by appellees to eliminate appellants and small tract owners from competing in the production of gas from the Appling field located in Calhoun and Jackson counties, Texas, and to restrict production from appellants' wells. The conspiracy was allegedly carried out by various means, one of which was the filing of false and fictitious nominations or Producers Forecasts with the Railroad Commission of Texas." 382 S.W.2d at 344–345.

In this light, our decision in Norman Tobacco & Candy Co. v. Gillette Safety Razor Co., 5 Cir. 1961, 295 F.2d 362, is directly in point. Plaintiff there had brought simultaneous but separate suits in the district court alleging in one that the defendant breached its contract to sell shaving products to plaintiff and alleging in the other that defendant's refusal to deal was a violation of the federal antitrust laws. The contract action went to trial first and Gillette won. Thereafter, the trial court entered summary judgment on behalf of Gillette in the antitrust case, and this court affirmed on the basis, inter alia, that the contract action was *res judicata* of the antitrust action:

"It is settled, contrary to appellant's contention, that a litigant may not split his claim and have two trials on the same alleged breach of duty. Basically, Norman claimed the same 'right' in both suits—the right to purchase Gillette products direct from Gillette. The only wrong charged against Gillette was its refusal to continue to deal with Norman. We held in the contract case that Norman had not shown that Gillette wrongfully refused to deal with it. There, appellant relied upon the breach of Gillette's supposed contractual relationship as the basis of its claim. Here, appellant relies upon the breach of the anti-trust laws as the basis for the alleged breach. But there was one breach and one only and appellant has had its day in court and has lost. It cannot litigate this same breach again. Ballard v. First National Bank of Birmingham, 5 Cir., 1958, 259 F.2d 681; F. L. Mendez & Company v. General Motors Corporation, 7 Cir., 1947, 161 F.2d 695, and Williamson v. Columbia Gas & Electric Company, 3 Cir., 1950, 186 F.2d 464, certiorari denied 1951, 341 U.S. 921, 71 S.Ct. 743, 95 L.Ed. 1355. The mere fact that in the case already decided Gillette's refusal to sell was alleged to have been wrongful for one reason and, in the present case for another reason, does not alter the fact

that the cause of action was for the same injury. Appellant cannot get away from the fact that there has been a violation of one right by a single legal wrong. Restatement, Judgments, Sec. 63."

295 F.2d at 363–364.

Similarly, in the instant case plaintiffs claimed violations of the same primary rights arising out of the same facts asserted in the state court suit. The state and federal antitrust claims here are, therefore, simply alternative grounds of recovery for the same causes of action. The principle of *res judicata*, enforceable by injunction, would thus preclude relitigation in the state following this federal judgment if the state and federal counts involve substantially the same wrongs measured by similar standards of liability so that recovery in the federal suit will have compensated plaintiffs for the total harm suffered. See Note, Parallel State and Federal Remedies, 71 Harv.L. Rev. 513, 523–24 (1957). Alternatively, even if different standards of recovery existed in the state and federal actions, *res judicata* would be applicable if plaintiffs were afforded an opportunity to allege the state grounds which constituted the same cause of action in the federal proceedings. See Restatement, Judgments § 62. Focusing on the latter test, we think that the doctrine of pendent jurisdiction, see Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, afforded plaintiffs opportunity for joinder.[11]

In United Mine Workers of America v. Gibbs, 1966, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218, the Supreme Court established a liberal rule for judging the availability of pendent jurisdiction:

"This limited approach is unnecessarily grudging. Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made,

or which shall be made, under their authority * * *,' U.S.Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole." Id. at 725, 86 S. Ct. at 1138 (footnote omitted).

See also Whirl v. Kern, 5 Cir., 1969, 407 F.2d 781, cert. denied, 1970, 396 · U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177; Note, United Mine Workers of America v. Gibbs and Pendent Jurisdiction, 81 Harv. L.Rev. 657 (1968). Numerous decisions have applied this principle to permit the joinder of federal antitrust claims and related state claims. E. g., Knuth v. Erie-Crawford Dairy Coop. Ass'n, 3 Cir. 1968, 395 F.2d 420; Otto Milk Co. v. United Dairy Farmers Coop. Ass'n, 3 Cir. 1967, 388 F.2d 789, 798; Peerless Dental Supply Co. v. Weber Dental Mfg. Co., E.D.Pa.1969, 299 F.Supp. 331. Since plaintiffs failed to assert all their claims even though the district court had power to adjudicate both their federal and state contentions, plaintiffs are barred from prosecuting the state court suit because the federal court suit was *res judicata* of all issues alleged in the state court. See McCann v. Whitney, Sup.Ct.1941, 25 N.Y. S.2d 354; Note, Parallel State and Federal Remedies, *supra*, at 523–25.

Clearly, therefore, at the time the trial court entered the injunction it was em-

---

11. Plaintiffs allege that they did in fact join their state claims in the federal action, but had them dismissed by the court.

We find this contention unfounded. An examination of the pleadings reveals no reference to any state claims.

powered to do so because there was at that time a final federal judgment on the same causes of action asserted in the state suit, which judgment it could protect by injunction.

The question arises, however, as to whether or not the injunction may be continued in light of our actions on appeal. We hold that the injunction may not be continued. It is clear that the power to issue an injunction restraining further proceedings in a state court rests on the existence of a final judgment which has a *res judicata* effect on the particular causes of action which are asserted in the state suit. It is also obvious that a judgment later reversed on appeal has no *res judicata* effect after the reversal. 1B J. Moore, Federal Practice ¶ 0.416 [2].

In the instant case we have reversed and remanded certain issues for trial. As to these issues there is now no final judgment and hence no basis for an injunction against further state court action. On another issue we have reversed the trial court and ordered the jury's verdict reinstated. As to this matter the trial court may, if it wishes, render a partial final judgment under Fed.R.Civ. P. 54. If the trial court does order such a partial final judgment, then it may enjoin further proceedings in the state suit on claims covered under the doctrine of *res judicata* by that judgment. In addition, when a judgment or judgments are rendered as to the other claims raised in this suit, then the trial court may in its discretion issue another injunction to protect the final judgment or judgments.

## IV.

We have at last reached the end of our long and protracted journey through the Appling Field and points beyond. We find it unnecessary to prolong that journey by a discussion of certain additional points of error raised by the parties, since we find them without merit. In view of the length of this opinion, we now summarize our conclusions.

First, we reverse the summary judgment for defendants with regard to the filing of false nominations and remand the issue for trial.

Second, we reverse the judgment n. o. v. with regard to monopolization and order the district court to reinstate the jury verdict which found both liability and damages. We further remand for trial the issue of damages flowing from defendants' alleged conduct with regard to the proposed extraction plant.

Third, we vacate the injunction restraining plaintiffs from prosecuting their state court suit, but we authorize the district court in its sound discretion to enjoin the future pursuit of some or all of the state claims if and when a complete or partial final judgment is entered in the instant case.

Reversed and remanded in part.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

Appellees' argument to the contrary notwithstanding, we think our opinion clearly states that the trial on remand with regard to the alleged filing of false nomination forecasts shall encompass all those issues which are associated with antitrust actions.