James F. MURDOCK, Plaintiff,

v.

CITY OF JACKSONVILLE, FLORIDA, et al., Defendants.

James F. MURDOCK, Plaintiff,

v.

Hans G. TANZLER, Jr., Individually, et al., Defendants.

Civ. Nos. 72-247 and 72-248.

United States District Court,
M. D. Florida,
Jacksonville Division.

June 28, 1973.

P. Donald DeHoff, Jacksonville, Fla., for plaintiff.

William Lee Allen, Jacksonville, Fla., for City of Jacksonville.

Robert P. Smith, Jr., Bedell, Bedell, Dittmar, Smith & Zehmer, Jacksonville, Fla., for L & G Promotions, Inc.

## SUMMARY FINAL JUDGMENT

CHARLES R. SCOTT, District Judge.

This cause came on for hearing on defendants' motions for summary judgment in these two companion cases numbered 72–247–Civ–J–S, hereinafter referred to as the antitrust case, and 72–248–Civ–J–S, hereinafter referred to as the civil rights case. The factual background giving rise to the two cases is identical and undisputed between the parties. Only questions of law remain for determination.

The antitrust case involves the liability of a private wrestling promoter, the City of Jacksonville, Florida, its mayor and its coliseum manager, for alleged violations of the Sherman Antitrust Act. The civil rights case involves the liability of the wrestling promoter, the mayor and the coliseum manager, for alleged violations of the federal civil rights act.

The defendant, Consolidated City of Jacksonville, through defendants, Hans G. Tanzler, Jr., Mayor of Jacksonville, and Richard McMeekin, Jacksonville Coliseum general manager, granted a lease to defendant, L & G Promotions, Inc. (L & G), a private Florida corporation, for the presentation of wrestling matches in Jacksonville Veterans Memorial Coliseum every Thursday evening.

The lease ran from January 1, 1972, to December 31, 1972, with an option to extend it for an additional four years. The option was exercised. A further provision prohibited the lessor from leasing "to any other lessee the premises covered by this lease or its Auditorium for wrestling matches." A resolution of the Jacksonville City Council provides that during the term of L & G's lease, no other lessee will be permitted to use the coliseum for wrestling matches.

The coliseum was constructed with bond money approved by the citizens of Jacksonville and is a public arena available for lease or rent for various types of entertainment for the general public. Plaintiff contends that it is the only facility in the downtown area of Jacksonville capable of entertaining large crowds for wrestling matches.

The legislative and administrative authorities of the City determined to rent the coliseum for wrestling only one night each week and to grant that night to defendant, L & G, rather than to plaintiff. Plaintiff contends that the exclusive lease provision and resolution of the City Council are violative of the federal civil rights act, 42 U.S.C. § 1983, and the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

Plaintiff seeks to have this Court declare the lease and restrictive covenant therein null and void as violative of these antitrust and civil rights laws, and further seeks to have this Court enjoin defendants from entering into any such exclusive lease agreement in the future, or in the alternative to permit rental of the coliseum by plaintiff on any date not already allocated.

## I. ANTITRUST CASE, NO. 72–247–Civ–J–S

### (A) *Summary Judgment for Lack of Proof on Certain Issues*

■ Plaintiff specifically alleges that L & G has threatened to "blackball" any wrestler who contracts to wrestle for an "independent promoter", such as plaintiff, and that the effect of such "blackball" is to prevent any wrestler who performs for plaintiff or another "independent promoter" from ever wrestling again for L & G. Plaintiff further alleges that L & G has, on at least one occasion, attempted to prevent competition by an independent promoter by leasing an armory and leaving it vacant on the night that the independent promoter had planned to stage a wrestling match in it.

The "blackball" and armory rental allegations may be readily resolved without reaching their merits. The allegation that L & G has threatened to "blackball" any wrestler who performs for the plaintiff, if true, would probably justify antitrust relief to an independent promoter shown to have been injured in his business as a result of the practice complained of. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Likewise, the allegation that L & G has prevented competition by an independent promoter by leasing an armory and leaving it vacant on the night that the independent promoter had planned to stage a match, if true, would probably justify antitrust relief to an independent promoter shown to have been injured in his business as a result of the practice complained of. But both of these allegations must fail at the summary judgment stage of this lawsuit because they are bare allegations of the complaint and are not supported by any affidavit "made on personal knowledge" setting forth "such facts as would be admissible in evidence" and signed by an affiant "competent to testify to the matters stated therein".

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Rule 56(e) of the Federal Rules of Civil Procedure.

Furthermore, the allegations of "blackballing" wrestlers and of leasing an armory only to leave it vacant have been denied by the uncontroverted affidavit of L & G's principal manager in testimony alleged to be made on personal knowledge. In his deposition he stated that neither he nor L & G has ever "blackballed" or declined to hire a wrestler because the wrestler wrestles for any independent promoter. He further stated that it was not uncommon for professional wrestlers to wrestle both for L & G and for other promoters within a very short time. In fact, he states, that at least two of the wrestlers who wrestled for plaintiff in the two wrestling matches he promoted in February, 1966, wrestled for L & G before that time and have done so since. Furthermore, he denied that L & G has ever leased an armory or other wrestling hall purposefully to leave it vacant and thereby to prevent any independent promoter or other person from having access to it for wrestling.[1]

Plaintiff has not offered any evidence of the truth of these two allegations, and they are, therefore, entitled to no consideration whatsoever. Rule 56(e) of the Federal Rules of Civil Procedure.

■ Even in an antitrust case a party cannot rest on the allegations contained in his complaint but must, in opposition to a motion for summary judgment, come forward with affidavits set-

---

1. Affidavit of Eddie Graham, filed herein August 3, 1972.

ting forth specific facts showing that there is a genuine issue of material fact for trial. Tripoli Company v. Wella Corp., 425 F.2d 932 (3d Cir. 1970); A & M Stores, Inc. v. Hiram Walker, Inc., 427 F.2d 167 (5th Cir. 1970); Beckman v. Walter Kidde & Co., Inc., 316 F.Supp. 1321 (E.D.N.Y.1970).

(B) *Antitrust Facts on Remaining Issues*

Plaintiff's primary antitrust allegations are that the exclusive lease agreement (1) constitutes a contract in restraint of trade in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, because it effectively denies him the right to conduct his business in Jacksonville since no other adequate or appropriate facility is available in the downtown area, and that the exclusive lease agreement (2) promotes an illegal monopoly in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

L & G or its predecessor in interest has rented the Jacksonville Coliseum on nearly every Thursday night for the production of professional wrestling matches from 1961, until the present time. These matches have produced revenue to the City in rental and concession income exceeding $100,000.00 per year; an amount which constitutes about 30% of the coliseum's annual budget.

In 1971 a City Council resolution raised the minimum fee to be realized by the lessor for renting the coliseum from $500.00 to $750.00 per night, or 12% of the gross amount of any type of admission fee received after deduction of taxes, whichever was greater.

Because of the importance to the City of maximizing the coliseum revenues in order to reduce the coliseum deficit, it is desirable that paid attendance at revenue-producing events in the facility regularly exceed the amount necessary to produce the minimum rental of $750.00. On 97 of the 113 wrestling dates of L & G during 1970, 1971, and through July, 1972, the City received revenue calculated as a percentage of admission fee rather than the minimum stipulated rental. In this period, therefore, the City received as rental $105,995.65 rather than the stipulated minimum rental, at $500.00 or $750.00 per date, of $64,500.00.

On February 8, 1966, the plaintiff produced a wrestling match at the coliseum from which the City realized the minimum rental and plaintiff realized a net loss of $388.07. A similar match was produced by plaintiff in the coliseum on February 15, 1966, from which the City realized the minimum rental and from which plaintiff realized a net loss of $1,609.85. Plaintiff has not produced a wrestling match in Jacksonville or elsewhere since.

Jacksonville City Council Resolution 71–746–315 grants the manager of the coliseum the discretion to prohibit the scheduling of two or more events of a similar nature within 14 days before and 14 days after each other. It is uncontroverted that because of the lack of attendance and resultant financial loss to the City occasioned by scheduling three similar musical events within a 14 day period, the defendant, Richard McMeekin, manager of the coliseum, has exercised the discretion granted him in the City Council Resolution by establishing an "absolute" policy of refusing to vary the "fourteen day buffer" rule.

In May, 1971, at the request of defendant Tanzler, defendant McMeekin conducted a review of wrestling promotions in Jacksonville. This review included the competing arguments submitted by both Mr. Murdock, plaintiff herein, and by Mr. Curtis for L & G.

It has been uncontradicted that the City Council held repeated hearings, conducted lengthy meetings and had heated debates between the various interests competing for the right to promote wrestling in the coliseum. The mayor's staff and the City Council concluded in their review that L & G had done a satisfactory job for the City of Jacksonville because wrestling had improved in popularity, and they further concluded that the revenues to the City were substantially increased over what they had been

before. They found that it was critical to the operation of the coliseum that such a large portion of the revenues not be jeopardized and that to allow anyone else to also promote wrestling, either before, after or in between the scheduled Thursday night matches, would be detrimental to the overall revenues and the popularity of wrestling itself.[2]

There can be no doubt that plaintiff Murdock has engaged in vigorous competition with L & G, not in the promotion of wrestling, but rather in attempting to wrest from L & G the opportunity to occupy the Jacksonville Coliseum for wrestling. That competition has continued for six years and was concluded by the City when, for compelling economic reasons, it agreed to the exclusive lease in favor of L & G.

### (C) *Antitrust Law on Exclusive Contracts*

■■ This contract, being exclusive in its nature, in that sense is a monopoly. However, such a contract is not necessarily illegal in violation of the antitrust laws.

The question of whether an exclusive lease *per se* creates a monopoly or constitutes a restraint on trade in violation of the antitrust laws has repeatedly been before the Courts, and the rulings have been almost unanimous that there is no violation.

In the landmark exclusive lease case of Donovan v. Pennsylvania Co., 199 U. S. 279, 26 S.Ct. 91, 50 L.Ed. 192 (1905), the Supreme Court upheld the right of a railroad company operating a terminal to enter into an exclusive lease arrangement with one taxi company to serve the premises.[3]

In Export Liquor Sales, Inc. v. Ammex Warehouse Co., 426 F.2d 251 (6th Cir. 1970), the Court of Appeals af-

firmed the dismissal of a complaint alleging that §§ 1 and 2 of the Sherman Act were violated when the owner of a vehicular tunnel between Detroit and Windsor, Ontario, granted an exclusive contract to Ammex to sell liquor on the premises. The Court said:

> [A] corporation with control over a unique location essential to the conduct of a certain kind of business can lease a part of that location to one entity and thereby give it an effective monopoly without violating the Sherman Act.[4]

The case of E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52 (1st Cir. 1966), upheld the right of the port authority to enter into an agreement to make the defendant therein the sole and exclusive fixed base operator at the airport, thus excluding a claimed competitor, without violating §§ 1 and 2 of the Sherman Act.

In Savon Gas Stations Number Six, Inc. v. Shell Oil Co., 309 F.2d 306 (4th Cir. 1962), the Court upheld, as against a somewhat similar contention, an exclusive contract between a shopping center and Shell which excluded any other gas station from using shopping center property.

In Parmalee Transportation Co. v. Keeshin, 292 F.2d 794 (7th Cir. 1961), the Court upheld, as against an antitrust violation claim, an exclusive contract whereby the railroad granted a certain company, Transfer, the exclusive right to transfer passengers and their baggage in the Chicago terminal. Parmalee, the competitor thus excluded from the terminal, brought suit under §§ 1 and 2 of the Sherman Act. Affirming the District Court's summary judgment for the defendants, the Court held:

> No interested bidder for the contract was prevented from competing for it.

> *See also,* Export Liquor Sales, Inc. v. Ammex Warehouse Co., 426 F.2d 251 (6th Cir. 1970).

---

2. Deposition of Hans G. Tanzler, Jr., taken June 9, 1972, at pp. 20–21, filed herein June 23, 1972.

3. This ruling was reiterated in United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

4. Export Liquor Sales, Inc. v. Ammex Warehouse Co., 426 F.2d 251, 252 (6th Cir. 1970).

Competition, which was formally opened November, 1954 by solicitation of bids and brought bids from plaintiff, Transfer and Willett, proceeded for more than six months. The competition between plaintiff and Transfer was always intense and finally became feverish. . . . An assertion that the competitive market for this contract was destroyed or that the competition for it was eliminated is belied by the record. While one competitor succeeded and necessarily the other failed, unmistakably there was very strenuous competition. This unavoidable fact undermines the plaintiff's charges under §§ 1 and 2 of the Sherman Act.[5]

In this case no abuse of discretion by the City Council, the mayor, or the coliseum manager has been shown. A full opportunity was afforded plaintiff to present his proposals to the City before the agreement was negotiated. Honest business judgment was exercised.

It is perfectly proper for the City to determine, as it has, to present a balanced entertainment program in its coliseum and to assign the one night weekly available for wrestling to defendant L & G, which has successfully promoted wrestling in the coliseum weekly for several years at great profit to the City, rather than to plaintiff who has produced only two wrestling matches in the last ten years, both of which resulted in only minimum rentals to the City and losses to the plaintiff.

L & G cannot be liable on the basis of the exclusive lease contract for violation of §§ 1 and 2 of the Sherman Antitrust Act nor can the City, its mayor or its coliseum manager. As a matter of law, the exclusive lease granted by the City to L & G was not violative of the Sherman Act. Therefore, summary judgment should be granted in favor of defendants and against plaintiff in the antitrust case.

Furthermore, the City, the mayor and the coliseum manager are immune from liability for antitrust violations under the facts of this case due to the doctrine of governmental immunity.

(D) *Governmental Immunity From Antitrust Liability*

■ The Supreme Court, in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L. Ed. 315 (1943), makes it clear that the antitrust laws are directed against individual action and not against state action.

The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain *state action* or *official action directed by a state*. The act is applicable to "persons" including corporations (§ 7), and it authorizes suits under it by persons and corporations (§ 15). . . . There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only "business combinations." [citation omitted] That its purpose was to suppress combinations to restrain competition and attempts to monopolize by individuals and corporations, abundantly appears from its legislative history. (emphasis supplied)[6]

■ The general rule is that a restraint upon trade or monopolization which is the result of valid governmental action, as opposed to private action, does not violate the Sherman Act. United States v. Rock Royal Co-op, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939); Eastern R. Conf. v. Noerr Motors, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); Alabama Power Co. v. Alabama Elec. Co-op, Inc., 394 F.2d 672 (5th Cir. 1968).

Nevertheless, not every governmental act or every action by a public official

---

5. Parmalee Transportation Co. v. Keeshin, 292 F.2d 794, 803–804 (7th Cir. 1961).

6. Parker v. Brown, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943).

automatically confers state action exemption.[7] "The concept of state action is not susceptible of rigid, bright-line rules. Each case must be considered on its own facts in order to determine whether or not the anti-competitive consequence is truly the action of the state." [8]

The Court of Appeals for the District of Columbia Circuit recently stated that the Fifth Circuit, in Woods Exploration & Prod. Co. v. Aluminum Co. of Amer., 438 F.2d 1286 (1971), had made a significant shift from its holding in *Alabama Power, supra,* the latter case being based on the flat assertion that "it is settled that neither the Sherman Act nor the Clayton Act was intended to authorize restraint of governmental action." [9]

This Court believes that the District of Columbia Circuit reads the *Woods* case too broadly. While *Woods* may have somewhat narrowed the scope of governmental immunity in antitrust cases in the Fifth Circuit, it did not effectively eliminate it.

*Woods* is clearly distinguishable from the case at bar. There the defendants, natural gas producers, supplied false gas marketing forecasts from which the Texas Railroad Commission regulated natural gas production. Defendants contended that any injury which a gas producer suffered because of the quota assigned to him was an injury directly inflicted by the railroad commission and not an injury inflicted by his fellow producers who filed the false statements upon which the commission based the quotas. Defendants further argued that since their false statements of production became a part of the commission's final production orders, plaintiff's alleged injury was solely the result of state action.

The Court of Appeals held that defendants' conduct in filing false forecasts was in no way merged with the action of the state, since the commission was neither the real decision maker nor would have intended its order to be based on false facts. Although the production quotas were so low as to damage the plaintiff, the injury was caused by fellow producers filing the false statements and not by the commission. Thus, the "governmental action immunity", which shielded the commission from antitrust liability, did not shield the defendants, who supplied the false information upon which the commission based its production quotas, from antitrust liability.

Thus, in *Woods,* the governmental immunity which the commission enjoyed, was not available to shield the actions of defendants.[10]

[W]hile we cannot hold that actions taken pursuant to Commission regulations violate the antitrust laws, we can hold that actions taken to subvert the Commission scheme for anti-com-

7. Woods Exploration & Production Co. v. Aluminum Co. of America, 438 F.2d 1286 (5th Cir. 1971).

8. *Id.* at 1294.

9. Hecht v. Pro-Football, Inc., 144 U.S. App.D.C. 56, 444 F.2d 931, n. 6 (1971). In that case the Court of Appeals for the District of Columbia Circuit held that the Armory Board of the District was not immune from antitrust liability when it granted a 30 year exclusive lease to the Washington Redskins which provided that they be the only professional football team to occupy the Robert F. Kennedy Stadium.
Perhaps that Court was influenced by the length of the lease to find that govern-mental immunity was not available to shield the armory board from liability from violation of the Sherman Act prohibition against contracts in restraint of trade. Or perhaps that Court was influenced by its interpretation of the case of Woods Exploration & Production Co., Inc. v. Aluminum Co. of America, 438 F.2d 1286 (5th Cir. 1971),—an interpretation this Court believes was overly broad and which exceeded the intent of the Fifth Circuit. Nevertheless, the ruling in *Hecht* is not controlling in this case and is, therefore, not applicable.

10. *Compare,* Okefenokee Rural Elec. Mem. Corp. v. Florida P & L. Co., 214 F.2d 413 (5th Cir. 1954).

petitive purposes are subject to antitrust strictures.

*Id.* 438 F.2d at 1303.

In *Woods* defendants sought to avail themselves of the immunity available to the commission. Here the City, its mayor and coliseum general manager are claiming the governmental immunity for themselves, not for third persons. Therefore, the narrowing of governmental immunity from antitrust actions in *Woods* does not apply to the facts of the instant case. That case is clearly distinguishable on its facts.

### (1) *State or Municipal Immunity*

■ At the outset the Court must determine whether the doctrine of governmental immunity is applicable to "municipal" action, or whether it is only operative when the action involved is at the "state" level.

Even if the action of the City, the mayor, and the coliseum manager in this case cannot be properly construed to be "state action" as that phrase is used in Parker v. Brown, *supra,* it certainly falls within the purview of "official action directed by a state" as that phrase is used in the same opinion. Thus, the municipal action involved in this case is entitled to the full scope of immunity available to "official action directed by a state".

The Consolidated City of Jacksonville, the charter [11] for which was adopted by public election in 1967, is a creature of the Florida Constitution [12] and of the Florida Legislature [13] and is a body corporate and politic. It possesses all the powers of a Florida city and all the powers of a Florida county.[14]

By statute, the City is granted the specific power to enter into contracts, [15] lease its property,[16] and operate a municipal coliseum.[17] Furthermore, the mayor is given specific authority to supervise the operation of the coliseum which is within the control of the Department of Recreational and Public Affairs.[18]

11. Chapter 67–1320, Laws of Florida.

12. Article 8, Section 9, Florida Constitution of 1885.

13. Chapter 65–1502, Laws of Florida.

14. Section 3.01, Article 3, of Chapter 67–1320, Laws of Florida, reads, in part, as follows:
Section 3.01. *General Powers.* The consolidated government shall have: (1) any and all powers which cities are, or may hereafter be, authorized or required to exercise under the Constitution or the general laws of the state of Florida; . . ; (2) any and all powers which counties are, or may hereafter be, authorized or required to exercise under the Constitution or general laws of the state of Florida, . . . ; (3) any and all powers which any of the former governments possessed immediately prior to the effective date of this charter.

15. Section 3.02 of Chapter 67–1320, Laws of Florida, provides, in part, as follows:
Section 3.02. *Specific Powers.* Without limiting the generality of the provisions of section 3.01 above, the consolidated government shall have power:
9. To enter into contracts and agreements with other governmental entities and with private persons, firms and corporations providing for services to be furnished and payments to be received therefor or for services to be received and payments to be made therefor.

16. Section 3.02 of Chapter 67–1320, Laws of Florida, provides, in part, as follows:
17. To purchase, lease, construct, maintain or otherwise acquire, hold and operate other property, real or personal for any public purpose, and to sell, lease or otherwise dispose of any property, real or personal, belonging to the consolidated government in such manner and upon such terms as the council shall determine.

17. Section 7.605 of Article 7, of Chapter 67–1320, Laws of Florida, provides for the Department of Recreation and Public Affairs of the City of Jacksonville, including the following statements:
Section 7.605. *Sports Complex and Auditorium Division.* The sports complex and auditorium division shall be responsible for planning, promoting, organizing, administering, and operating the consolidated government's sports complex and auditorium facilities which includes the . . . Auditorium.

18. Section 6.03, Article 6, of Chapter 67–1320, Laws of Florida, provides, in pertinent part, as follows:
The mayor shall administer, supervise and control all departments and divisions created by this charter and all depart-

Section 9, Article VIII of the Florida Constitution of 1885, F.S.A., as amended, reads, in part, as follows:

*Section 9.* Legislative power over city of Jacksonville and Duval County.— The Legislature shall have power to establish, alter or abolish, a municipal corporation to be known as the City of Jacksonville, extending territorially throughout the present limits of Duval County, . . . and shall prescribe the jurisdiction, powers, duties and functions of such municipal corporation, its legislative, executive, judicial and administrative departments and its boards, bodies and officers; . . . *Such municipality may exercise all the powers of a municipal corporation and shall also be recognized as one of the legal political divisions of the State* with the duties and obligations of a county and shall be entitled to all the powers, rights and privileges, . . . which would accrue to it if it were a county. (emphasis supplied)

Since a state rarely acts except through one or more of its political subdivisions, if governmental immunity is to have any but the most limited efficacy it must be available to protect the political subdivisions of the state from antitrust liability. The municipal government of Jacksonville, being a political subdivision of the State of Florida, may legitimately avail itself of governmental antitrust immunity to the same extent that the State of Florida would be entitled to such immunity in this case.

A similar ruling that a political subdivision of the state is entitled to governmental immunity from antitrust liability

was made in E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority.[19] In that case the Court of Appeals for the First Circuit held that the Massachusetts Port Authority was exempt under the governmental immunity doctrine from antitrust liability for its action in entering into an exclusive lease agreement to allow only one fixed base operation at the Logan Airport.

It is clear that in doing so it [Massachusetts Port Authority] was acting as an instrumentality or agency of the state, pursuant to the legislative mandate imposed upon it to operate and manage the airport and establish rules and regulations for its use.[20]

In Ladue Local Lines, Inc. v. Bi-State Development Agency,[21] the Court of Appeals for the Eighth Circuit held that governmental immunity[22] protected a body politic created by the legislatures of Missouri and Illinois from antitrust liability for the operation of a monopolistic passenger transportation facility.

[I]f the State has the power to regulate, and in so doing to appoint and commission, . . . it must follow that no monopoly or combination in a legal sense can arise from the fact that the duly authorized agents of the State are alone allowed to perform the duties devolving upon them by law.[23]

The Court therein specifically found the proposition well settled that the antitrust laws do not apply to state government or activities undertaken pursuant to legislative mandate.

The action of the City in entering into the exclusive lease with L & G Promotions necessarily had an anti-competitive

---

ments and divisions created by ordinance or resolution hereafter.

19. 362 F.2d (1st Cir. 1966).

20. *Id.* at 55.

21. 433 F.2d 131 (8th Cir. 1970).

22. The Court in *Ladue* said they did not reach the question of "immunity" since there was no attempt on the part of Congress to impose liability under the antitrust laws in the first place. But in the

context of this case the legal effect is the same whether the state is protected from antitrust liability because it is "immune" or because it never was intended to be within the purview of the antitrust acts.

23. Ladue Local Lines, Inc. v. Bi-State Development Agency of Missouri-Illinois Metropolitan District, 433 F.2d 131, 134 (8th Cir. 1970).

effect upon all other private wrestling promoters seeking to use the coliseum, including plaintiff. Here, however, the City Council impliedly found that competition in wrestling at the coliseum was not the *summum bonum* by deliberately authorizing the City to enter into the exclusive lease. George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25, 30 (1st Cir. 1970).

Since the City is not engaging in the promotion of wrestling, its only act which is or properly may be challenged herein is the alienation of its property by exclusive lease to L & G for wrestling matches. Lease of city property was specifically authorized by the Florida Legislature; thus, there is no issue of whether granting the lease involves a governmental or proprietary function. In this case the exclusive lease was negotiated after careful study of the factors supporting and opposing such action, and only after full consideration of the relative advantages to the City.

Therefore, because of the thorough investigation and study conducted by the City before signing the exclusive lease, because of the conscious determination by the City Council that an exclusive lease provided the greatest advantages to the City, and because of the legislative authorization to operate a coliseum and lease its property, the Court concludes that the City of Jacksonville is immune from liability for violation of the Sherman Act in this case.

### (2) *Governmental Immunity Available to Persons*

■ Clearly the immunity enjoyed by the City is not available to the private corporate entity L & G Promotions. Hecht v. Pro-Football, Inc., 144 U.S. App.D.C. 56, 444 F.2d 931 (1971); George R. Whitten, Jr., Inc. v. Paddock Pool Builders, 424 F.2d 25 (1st Cir. 1970); Asheville Tobacco Bd. of Trade, Inc. v. Federal Trade Commission, 263 F.2d 502 (4th Cir. 1959). L &

G's antitrust liability must rise or fall on other grounds. But the issue of governmental immunity so far as the defendants Tanzler and McMeekin are concerned, is whether they may avail themselves of the immunity enjoyed by the City to shield them from personal antitrust liability?

The *Wiggins Airways* case again provides the Court with guidance in this area. In that case the Court found that governmental immunity protected the state agency from antitrust liability, and further found that the individual members of the agency enjoyed the same protection.

> Every member of a state agency has an existence distinct from that of the state and can be sued in his own name. But in carrying out the official duties with which the state charges him, he acts for the state and his action is not subject to the antitrust laws.[24]

In a somewhat similar case involving governmental immunity from antitrust liability as applied to the members of a state employees group commission, the Court found that the commissioners enjoyed the same protection as the state for their official acts.

> They [the commissioners] are described as such [members of the commission] in the complaint and the only actions by them which are set forth therein are actions taken in the carrying out of their official duties as agents of the Commonwealth. . . . [T]he action against its official agents, based on their official acts in carrying out their duties under the statute is in substance an action against the state itself, and hence one to which the jurisdiction of this court, in the absence of any waiver by the state of its immunity, does not extend.

Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299, 303 (D.Mass. 1957).

24. E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52, 56 (1st Cir. 1966).

The actions of Tanzler and McMeekin were mandated by the City Council and were fully within the scope of their official duties as duly elected or appointed officials of the City government. There is no allegation that their acts were in any way *ultra vires*. No lack of good faith on their part has been shown in order to remove them from the umbrella protection of the cases which hold that private antitrust actions are not maintainable for governmental activities of the sort presented in this case.

As a matter of law, the doctrine of governmental immunity is applicable to this case to protect the City of Jacksonville, its mayor and its coliseum manager from liability for alleged violations of the Sherman Antitrust Act. Therefore, summary judgment should be granted in favor of defendants Jacksonville, Tanzler and McMeekin in this, the antitrust case.

## II. CIVIL RIGHTS CASE, NO. 72–248–Civ–J–S

■ Plaintiff alleges that he has a substantial interest, protected by the First and Fourteenth Amendments to the United States Constitution, in promoting wrestling exhibitions; and further alleges that the failure of defendants, McMeekin and Tanzler, to execute a lease of the coliseum to him denies him rights protected by the aforesaid amendments.

Plaintiff also alleges that, because no other facility of capable quality and accessibility is available in downtown Jacksonville for wrestling, the exclusive lease denies him the right to conduct his business in the City, and such action constitutes a denial of the constitutionally guaranteed equal protection of the laws.

Plaintiff asserts that Resolution 71–627 of the Jacksonville City Council required that only wrestlers who were members of the National Wrestling Alliance could perform in the coliseum. He contends that many of the wrestlers he, as an independent promoter, sought to engage for performances in Jacksonville were not members of the alliance, and this restriction constituted a violation of his constitutional rights. Apparently Resolution 71–627 was withdrawn by the City Council so this allegation is moot.[25]

The allegation that, since there is only one facility in the downtown area capable of adequately housing a wrestling match, he is being denied the equal protection of the law because he cannot engage in his chosen profession in Jacksonville, is defeated by his own actions subsequent to the filing of this lawsuit. In a letter dated April 23, 1973, from plaintiff's counsel to the Court, the Court was advised that plaintiff had applied to the City for use of the Gator Bowl for promoting wrestling matches. In a letter dated May 7, 1973, the same party advised the Court that arrangements were being made to permit plaintiff to use the Gator Bowl for the express purpose of promoting a wrestling match.

Therefore, it is apparent that plaintiff's contention that no other wrestling facility is available in the downtown area must fail, and with it the claim that he has been denied the right to engage in his chosen profession, that is, promoting wrestling matches.

Plaintiff's primary contention that denial of the use of the coliseum violates his First Amendment rights, must rise or fall depending on the resolution of the issue whether wrestling, as plaintiff intended to promote it, is an activity protected by the First Amendment as free speech.

The following colloquy occurred at plaintiff's deposition:

Q Mr. Murdock, with respect to the complaint in No. 248 dealing with

---

25. *See* page 5 of the complaint in Case No. 72–247–Civ–J–S (the antitrust case herein), where plaintiff states that "Resolution No. 71–627 was later withdrawn".

First Amendment rights and civil liberties, would you tell us whether in connection with your proposed wrestling matches to be held in the Jacksonville Coliseum, you had proposed to have any political ideas or social ideas expounded by the wrestlers or by you, or were they just going to wrestle for the entertainment of those who came?

A Wrestle for the entertainment.

Q You don't have in mind, do you, any particular political philosophy or social philosophy that you would want to expound in connection with wrestling matches, do you?

A I like to put them on as a means of making a living.

Q You haven't been deprived of the facilities of the Coliseum or of any other hall in town for the purpose of announcing your political or social ideas, have you?

A No. I've been—I'm being denied the right to rent the Coliseum for a presentation of wrestling.

Q You haven't been denied the right to rent the Coliseum for political speech or for—

A I've never asked

Q —any social message carried by theatre or any other medium, have you?

A No.

Q And you don't make films, do you?

A No, sir.

Q Movie films?

A No, sir.

Q And you haven't written any books?

A No, sir.

Q And it's not part of your idea with respect to promoting wrestling that the wrestlers stop wrestling and make speeches to the crowd or try to advance any particular philosophy of your own?

A No, sir, that's not what people pay to see.[26]

There can be no serious contention, and none has been advanced by plaintiff, that wrestling constitutes "pure speech" as that phrase is used by the Supreme Court.[27] Neither does this Court believe that wrestling is an activity "akin to free speech" as that phrase was used in Tinker v. Des Moines Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In that case the Court held that the symbolic act of wearing politically significant armbands to protest the Vietnam war was "akin to free speech".

▇▇▇▇ In numerous cases the Supreme Court has defined the types of symbolic acts which, like the armbands in *Tinker*, fall within the protection of the Free Speech clause of the First Amendment. Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), holds that displaying a flag or banner is conduct protected by the First Amendment. Likewise, in Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), the Court upheld the right to peacefully picket a business establishment as protected "speech plus". Similarly, an ordinance cannot prohibit the distribution of religious matter from door to door without violating the purveyor's First Amendment freedoms.[28] Nor can a state law prohibit the peaceful assembly of citizens at the site of state government to express their griev-

---

26. Deposition of James F. Murdock, taken June 14, 1972, at pp. 6–7, filed herein June 20, 1972.

27. For example, in Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), the Supreme Court held that picketing and parading were intertwined with expression and association, but that such a combination of conduct with speech is not "pure speech".

28. Martin v. Struthers, Ohio, 319 U.S. 141 (1943) 63 S.Ct. 862, 87 L.Ed. 1313.

ances without violating the First and Fourteenth Amendments.[29]

■■■ The symbolic acts which were protected by the First and Fourteenth Amendments in those cases have no constitutional resemblance to the promotion of a wrestling match for entertainment. The promotion of wrestling matches in this case is not a symbolic act, nor is the wrestling match itself a symbolic act, protected by the First Amendment. Wrestling is just not "free speech", "akin to free speech", nor a "symbolic act".

Plaintiff cites the case of Hummel v. Tanzler, Case No. 70–444–Civ–J, for the proposition that the City may not deny him the use of the coliseum for wrestling. That case is inapposite. There, the Court enjoined the City of Jacksonville from prohibiting attorney William Kunstler from delivering a speech in the City Auditorium. The Court found that there was no evidence that the speech would present such a clear and present danger as to justify limitation of plaintiff's First Amendment freedoms.[30]

This case does not involve a speech by a public figure or anything of that nature, but only concerns the right to promote wrestling, a purely entertainment pastime. There is no evidence which could conceivably support the idea that the promotion of professional wrestling involves speech or symbolic acts equivalent to speech which was protected in *Hummel.*

Plaintiff supports his claim by citing numerous cases,[31] all of which involve the infringement of First Amendment rights. This Court having determined that wrestling is not protected by the First Amendment, plaintiff's cases are inapplicable.

■■■ Even if the Court were disposed to grant plaintiff some relief, the relief he seeks is inappropriate. Among other requests, he asks that the Court direct defendants to rent the coliseum to him on any open days of the week. It is a rule of general application that mandamus will not lie to review or control the acts of public officers in respect to matters as to which they are vested with discretion.[32] The Court will not order defendants to rent the coliseum to plaintiff because the decision of whether to lease City property and to whom such demise should be made is discretionary with defendants and is not a ministerial task subject to mandamus.

■■■ Plaintiff was afforded full due process of law before the City determined to grant the exclusive lease to L & G. The parties submitted competing arguments. The City Council held repeated hearings, conducted lengthy meetings and had heated debates between the vying interests. Therefore, plaintiff's claim of denial of due process must fail.

29. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

30. *See also,* United States Servicemen's Fund v. Shands, 440 F.2d 44 (4th Cir. 1971) ; Bynum v. Schiro, 219 F.Supp. 204 (E.D.La.1963).

31. Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) ; Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945) ; Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L. Ed. 1423 (1939) ; Southeastern Promotions v. West Palm Beach, 457 F.2d 1016 (5th Cir. 1972) ; United States Servicemen's Fund v. Shands, 440 F.2d 44 (4th Cir. 1971) ; Wolin v. Port of New York Authority, 392 F.2d 83 (2d Cir. 1968).

32. Adams v. Nagle, 303 U.S. 532, 58 S.Ct. 687, 82 L.Ed. 999 (1938) ; United States, ex rel. Girard Trust Co. v. Helvering, 301 U.S. 540, 57 S.Ct. 855, 81 L.Ed. 1272 (1937) ; United States, ex rel. Chicago Great Western RR. Co. v. ICC, 294 U. S. 50, 55 S.Ct. 326, 79 L.Ed. 752 (1935) ; Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809 (1930) ; Work v. United States ex rel. Rives, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561 (1925) ; Couch v. City of Villa Rica, Georgia, 203 F.Supp. 897 (N.D.Ga.1962) ; Loeb Co. v. Avoyelles Drainage District No. 8, 92 F.Supp. 126 (W.D.La.1950) aff'd 189 F.2d 965 (5th Cir. 1951).

The Supreme Court of Washington, in State v. City of Spokane [33] held that where the city council refused to rent the municipal coliseum for amateur hockey on specified dates, after renting it for different dates to another hockey team, there was no abuse of discretion or violation of equal protection of the laws. The Court found that the city council had discretion to determine to whom and on what conditions the auditorium should be rented. A committee found, after hearing, that the city was not large enough to support two hockey teams, and that there would be a loss of revenue to the city if the games were poorly attended.

 It is of constitutional import that neither the City, its mayor or its coliseum manager banned any particular type or character of program from the coliseum. For example, they did not prohibit the presentation of wrestling matches in general. Nevertheless, plaintiff contends that the exercise of business judgment in determining that only one promoter would be permitted to present wrestling in the coliseum during the pendency of the subject exclusive lease gives impermissible discretion to City officials.

Plaintiff cites numerous cases [34] which hold that a public official may not be vested with broad discretion for determining arbitrarily and without standards in what manner and by whom activities protected by the First and Fourteenth Amendments may be conducted. These cases are inapposite because the Court has determined that wrestling is not such a protected activity.

For the foregoing reasons the Court concludes that plaintiff does not have a constitutional right based on the First or Fourteenth Amendments, nor does he have a statutory right based on the Sherman Antitrust Act, to rent the Jacksonville Coliseum for wrestling during the pendency of L & G's exclusive lease.

---

33. 53 Wash.2d 35, 330 P.2d 718 (1958); Cf. International Expositions, Inc. v. Miami Beach, 274 So.2d 29 (Fla.Dist.Ct. App.1973).

34. Shuttlesworth v. Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); United States Servicemen's Fund v. Shands, 440 F.2d 44 (4th Cir. 1971); Southeastern Promotions, Ltd. v. City of West Palm Beach, 457 F.2d 1016 (5th Cir. 1972); Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964).